UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| **BRITTNEY BROWN**, <br><br>     Plaintiff, <br><br> v. <br><br> **ROGER A. YOUNG** in his official capacity as Executive Director of the Florida Fish and Wildlife Conservation Commission, and **MELISSA TUCKER**, in her individual capacity, <br><br>     Defendants. | )<br>)<br>)  CASE NO.:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# <u>COMPLAINT</u>

In the wake of the killing of Charlie Kirk on September 10, 2025, many individuals and groups posted visceral reactions to social media that covered a wide range of perspectives and beliefs. Most people on social media almost certainly encountered speech they found despicable, no matter where they fall on the political spectrum. That is the nature of a democracy where free speech is protected. And just as political violence has no place in a just society, the unbridled trampling of constitutional protections has no place either. One of the outcomes of the tragedy of Mr. Kirk's death has been a tremendously increased fervor for censorship. Indeed,

government actors at all levels have called for Americans to lose their jobs and livelihoods because they exercised their right to freely express political views that are controversial — a right Mr. Kirk himself exercised and encouraged for others. Yet the basic freedom to talk about the biggest public issues of the day, and to debate and even condemn the political views of others, is fundamental to our democracy. And it is that basic freedom that the State of Florida has denied Plaintiff Brittney Brown.

1.    Plaintiff brings this suit pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief against Defendants for their violation of her First and Fourteenth Amendment rights. Plaintiff also demands damages against the Defendants for losses occasioned by their unconstitutional retaliation against her in violation of the First Amendment.

## JURISDICTION

2.    This suit is brought pursuant to 42 U.S.C. § 1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

3.    This Court has "federal question" jurisdiction pursuant to 28 U.S.C. § 1331 to hear cases arising under the Constitution of the United States; under 28 U.S.C. § 1343(3) to redress the deprivation under color of state law of any right, privilege, or immunity secured by the Constitution; and under 28 U.S.C. § 1343(4) to secure equitable or other relief for the protection of civil rights.

4.    The Court has the authority to issue declaratory judgments and permanent injunctions pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 65 of the Federal Rules of Civil Procedure.

5.    The Court may enter an award of attorney's fees pursuant to 42 U.S.C. § 1988.

6.    This Complaint seeks declaratory and injunctive relief to prevent violations of the Plaintiff's rights, privileges, and immunities under the Constitution of the United States and 42 U.S.C. §§ 1983 and 1988, specifically seeking redress for the deprivation under color of state statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States. The rights sought to be protected in this cause of action arise and are secured under the First and Fourteenth Amendments to the Constitution.

7.    This action seeks a judicial determination of issues, rights, and liabilities embodied in an actual and present controversy between the parties

involving the constitutionality of certain policies and practices of Defendants. There are substantial *bona fide* doubts, disputes, and questions that must be resolved concerning Defendants' actions taken under color and authority of state law and procedures, in violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

## **VENUE**

8.    Venue is proper in the Northern District of Florida, Tallahassee Division, since Defendants are situated in Tallahassee, and a substantial part of the actions complained of occurred within the district and geographical area assigned to the Tallahassee Division. 28 U.S.C. § 1391(b); N.D. Fla. R. 3.1.

## **PARTIES**

9.    Plaintiff, BRITTNEY BROWN, (hereinafter "Brown" or "Plaintiff"), is an individual, *sui juris*, residing in Bay County, Florida.

10.    Plaintiff is a skilled biologist by virtue of both academic training and extensive on-the-job experience. Plaintiff graduated *cum laude* with a Bachelor of Science in Fisheries, Wildlife, & Conservation Biology and a minor in Biological Sciences from North Carolina State University.

11.    At all times material hereto, Brown was employed by the Florida Fish and Wildlife Conservation Commission ("FWC") as a "Fisheries & Wildlife

Biological Scientist III, Critical Wildlife Area Biologist". She works in FWC's Wildlife Diversity Conservation Section, which exists within the Division of Habitat and Species Conservation. As a Biological Scientist III, Plaintiff was principally assigned the task of studying and monitoring imperiled shorebirds and seabirds on Tyndall Air Force Base Critical Wildlife Area and adjacent beaches. Plaintiff also assisted with diamondback terrapins and sea turtle operations and rescues.

12.    Plaintiff was the principal author for FWC's weekly and annual reports to Tyndall Air Force Base partners, including, most recently, the "Tyndall Critical Wildlife Area 2024 Nesting Season Summary".

13.    Plaintiff assisted with in-field training pertaining to the FWC shorebird program both for new FWC staff and for volunteers.

14.    Plaintiff was employed by FWC for approximately seven years.

15.    Plaintiff excelled at her job. She received performance-based raises from her superiors every year since 2019. Her statewide team awarded her the "Got Your Back Award" at the 2024 FWC Shorebird Program Meeting ("For always supporting their colleagues"). This year, she has been advised by her peers that they intend to nominate her for the Division of Habitat and Species Conservation's "Purveyor of Awesomeness Award".

16.     Plaintiff's work at FWC represented not just a livelihood, but a means of pursuing her life's passion while simultaneously providing socially and scientifically valuable services.

17.     Defendant, ROGER A. YOUNG ("Young"), is the Executive Director of FWC. In that capacity, Young is responsible for carrying out all statutes and regulations within the jurisdiction of the FWC. Young is also ultimately responsible for all personnel decisions involving employees of the FWC, including the Plaintiff herein. Young is sued only in his official capacity.

18.     Defendant MELISSA TUCKER ("Tucker") is a natural person, *sui juris*, employed by the FWC as its Director of the Division of Habitat and Species Conservation, which oversees the Wildlife Diversity Conservation Section. At all times material to this action, Tucker acted in her capacity as Director of the Division of Habitat and Species Conservation. Tucker was Plaintiff's ultimate supervisor. Tucker is sued in her individual capacity.

## COLOR OF STATE LAW

19.     Defendants are public officials and officials of a state agency and are acting under color of state law and authority.

20.     Defendants' actions, taken under color of state law, violate Plaintiff's constitutional rights to engage in free speech.

## FACTS RELATIVE TO PLAINTIFF'S TERMINATION

21.    Plaintiff has a private social media account on Instagram which is accessible by friends and acquaintances who "follow" her but is not accessible to all Internet users. The Instagram account has no connection with Plaintiff's work for the FWC; it is a purely private account.

22.    Plaintiff follows a social media account on Instagram called "@awhalefact",[1] which is a parody/satirical account that pretends to speak on behalf of a whale. The @awhalefact posts include a variety of messages, some which are silly:



_____

[1] https://www.instagram.com/awhalefact/.

and some of which comment on matters of public concern – often from a wry or

idiosyncratic viewpoint[2]:



a whale would never judge you for
where you come from, but definitely
does judge you for the amount of
plastic in the ocean

23.     On or about Wednesday, September 10, 2025, @awhalefact posted the

following on Instagram:

> "the whales are deeply saddened to learn of the shooting of charlie kirk, haha
> just kidding, they care exactly as much as charlie kirk cared about children
> being shot in their classrooms, which is to say, not at all"[3]

24.     The @awhalefact post references the shooting of Mr. Kirk on

September 10, 2025, and his past controversial remarks on school shootings. Mr.

Kirk was a prominent conservative activist who was known for sharing his often

controversial viewpoints through podcasts and debates on college campuses.[4]

---

[2]  https://www.instagram.com/awhalefact/;  posts  of  9/20/22  and  4/14/19,
respectively (last accessed 9/30/25).

[3]  It appears that this post was subsequently removed as it is not presently accessible.

[4]  See generally https://en.wikipedia.org/wiki/Charlie_Kirk (last accessed 9/30/25).

Among the views he shared was that "it's worth to have a cost of, unfortunately, some gun deaths every single year so that we can have the Second Amendment to protect our other God-given rights" and that school shootings could best be addressed by having more armed guards at schools.[5]

25.    On the same date, Plaintiff, who was on vacation and out of state, reposted @awhalefact's  message to her "story" on her private Instagram account.

26.    A repost is essentially copying and pasting a message from another website or social media source onto one's own site or page to share with one's followers. A story is a feature on Instagram that temporarily displays your post for 24 hours before it is automatically archived. If your account settings are set to "private", as Brown's were, stories are visible only to the followers you have accepted.

27.    Plaintiff intended her repost to convey a particularized political message which is apparent from the text itself. That political message incorporates the following ideas:

---

[5] Media Matters Staff, *Charlie Kirk: "It's worth to have a cost of, unfortunately, some gun deaths every single year so that we can have the Second Amendment"*, *Media Matters for America*, Apr. 6, 2023, https://www.mediamatters.org/charlie-kirk/charlie-kirk-its-worth-have-cost-unfortunately-some-gun-deaths-every-single-year-so-we.

A.    Nature is indifferent to human affairs.

B.    Mr. Kirk's ideology included supporting gun rights even at the expense of innocents, such as children in their classrooms.

28.    Plaintiff's political statement does not condone Mr. Kirk's killing; nor does it call for further violence.

29.    Mr. Kirk was a public figure widely known for his controversial political views, and his death is a matter of public concern. At the time Plaintiff reposted this message, Mr. Kirk's killing was ***the*** topic of discussion across the nation. The President and much of his cabinet attended Mr. Kirk's memorial along with some 90,000 of his followers.[6] Mr. Kirk's legacy remains a point of contention among both politicians and citizens in Florida and everywhere else in the country.

30.    Plaintiff's political post is fully protected by the First Amendment to the United States Constitution, made effective against the States through the incorporation doctrine of the Fourteenth Amendment.

31.    Political speech on matters of public interest and concern lies at the core of the First Amendment.

---

[6]    See   https://www.foxnews.com/politics/charlie-kirk-honored-90k-one-largest-memorials-private-citizen (last accessed 9/30/25).

32.    Plaintiff's post does not fall within any of the narrow categories of speech which are excluded from the protection of the First Amendment:[7]

A.    Plaintiff's post did not pose any risk of imminent incitement to lawless action and did not include any "fighting words"; it was a political statement disseminated by way of the Internet; was not directed at any particular person or group; did not employ any epithets or racial slurs; was sent under calm circumstances; and did not call for the commission of any violent act.

B.    Plaintiff's post was not a true threat; the post did not threaten anyone but merely stated a political opinion about a political figure.

C.    Plaintiff's post was not obscene in whole or in part; the post does not depict or describe any sexual act that might appeal to the prurient interest.

D.    Plaintiff's post was not defamatory in whole or in part; the post represented a pure political opinion which cannot be proven true or false and which contained obvious elements of rhetorical hyperbole.

E.    Plaintiff's post was not associated with any criminal conspiracy and was not integral to criminal conduct; no crime was suggested, contemplated, or associated with this political post.

---

[7] See generally United States v. Stevens, 559 U.S. 460, 468–69 (2010); Counterman v. Colorado, 600 U.S. 66, 73–74 (2023).

F.    Plaintiff's post was not involved in any fraud and did not propose any fraudulent transaction; the post was a noncommercial political statement.

G.    Plaintiff's post did not invade any registered copyright, trademark or patent or otherwise infringe anyone's intellectual property rights.

H.    Plaintiff's post was not treasonous or a call for insurrection, nor did it betray any state secrets or threaten the nation's security.

33.    Plaintiff's repost was not connected with her employment in any respect. Plaintiff alleges the following particulars:

A.    The repost was not shared during work hours and did not involve any State property, money, or resources. Instead, the repost was shared from Brown's personal phone while she was on vacation out of state.

B.    Plaintiff's post was not made in connection with her employment and was not part of her job responsibilities.

C.    Plaintiff was employed as a wildlife biologist and not as a public information officer. In addition, the death of Mr. Kirk has nothing to do with the function or purposes of the FWC.

D.    While the post mentioned whales, Plaintiff's job duties do not involve whales; indeed, whales are outside of FWC jurisdiction except for the rare instances

when a whale gets stuck on shore or a carcass washes ashore. Even still, Plaintiff would have no job duties related to whales.

      E.     The FWC did not request or direct Plaintiff to make this repost.

      F.     Plaintiff did not identify herself as an employee of the FWC on her Instagram account. The FWC is not mentioned anywhere in the text of the repost, Plaintiff does not appear in any recognizable uniform, and there would be no reason for the general public to link or associate Plaintiff's post with the FWC.

      G.     Plaintiff was not purporting to speak for or on behalf of the FWC; the text and circumstances show that Plaintiff was making a purely personal political statement unconnected with her employer.

      34.     On Sunday, September 14, 2025, at approximately 9:48 A.M. Central Time an individual or group known as "Libs of TikTok" shared a screenshot of Brown's post aside a screenshot of her LinkedIn profile on x.com. The screenshot was accompanied by text suggesting that Plaintiff should be fired from her position at the FWC[8]:

---

[8] https://x.com/libsoftiktok/status/1967254164876272097 (last accessed 9/30/25).



35.    The general public would never have known that Plaintiff was a public employee of any agency but for the doxing[9] engaged in by the "Libs of Tik Tok" account on social-media platform X.

36.    Libs of TikTok is a username for various social-media accounts operated by Chaya Raichik, who uses the accounts to repost content created by politically liberal people on various social-media platforms, often with mocking or derogatory commentary.

---

[9] Doxing involves making someone's private or identifying information public, usually with malicious intent.

37.    On information and belief, Plaintiff alleges that Libs of TikTok is closely followed by senior officials in the DeSantis administration and in Florida's Legislature.

38.    On that same September 14, 2025, Sunday evening, at 5:34 P.M. Central Time — mere hours after the Libs of TikTok tweet — an official with the FWC posted the following statement: "We've been made aware of an FWC employee's recent social media post and we do not condone nor tolerate this type of hateful sentiment. We're actively working towards a swift and immediate resolution regarding this individual's employment." This statement was posted officially through the FWC X account[10]:



<hr />

[10]  https://x.com/MyFWC/status/1967356249022009566    (last accessed 9/30/25). Screenshots to this and other social media posts include herein were taken in the Eastern time zone, so timestamps reflect eastern, rather than central, time.

39.     The FWC press release was made after hours on a weekend. On information and belief, Plaintiff alleges that the FWC seldom, if ever, issues a press release outside of normal 9–5 hours during the work week.

40.     At approximately 8:55 A.M. Central Time on September 15, 2025 — less than 24 hours after the publication of the Libs of TikTok post, Plaintiff received a call from her direct supervisor asking her to come into the office. Plaintiff was told to choose between resignation and termination.

41.     Plaintiff responded that she wished to consult with an attorney.

42.     At approximately 9:35 A.M. Central Time on September 15, 2025, the Regional Director of the FWC came onto Plaintiff's property accompanied by a law enforcement officer. The Regional Director delivered a termination letter advising Plaintiff that she had been fired from her employment. A copy of the termination letter is attached as Exhibit "1" to this Complaint.

43.     On information and belief, Defendant Young made the decision to terminate Plaintiff after consultations with senior officials in the DeSantis administration.

44.     The formal termination of Plaintiff's employment was carried out by Defendant Tucker, who executed the termination letter.

45.     At 9:45 A.M. Central Time, Libs of TikTok posted a statement on X confirming that FWC had terminated Plaintiff's employment [11]:



46.     At 10:55 A.M. Central Time, FWC released another press release on X announcing that Plaintiff had been fired[12]:

---

[11]  https://x.com/libsoftiktok/status/1967600668275003748 (last accessed 9/30/25).

[12]  https://x.com/MyFWC/status/1967618398873084198 (last accessed 9/30/25).



**MyFWC** ✔
@MyFWC

This weekend, we were made aware of a deeply troubling incident involving an FWC employee who shared a social media post that made light of the assassination of Charlie Kirk. The comments and actions of this individual are not in line with the FWC, our values, or our mission. We have a zero-tolerance policy towards the promotion of violence and hate, and we will not stand for such behavior. Upon learning of the social media post, FWC leadership took swift action, terminating the individual. We expect all our employees to conduct themselves with the utmost professionalism and always keep the public's trust in mind.

11:55 AM · Sep 15, 2025 · **412.3K** Views

47.    That post stated:

> "This weekend, we were made aware of a deeply troubling incident involving an FWC employee who shared a social media post that made light of the assassination of Mr. Kirk. The comments and actions of this individual are not in line with the FWC, our values, or our mission. We have a zero-tolerance policy towards the promotion of violence and hate, and we will not stand for such behavior. Upon learning of the social media post, FWC leadership took swift action, terminating the individual. We expect all our employees to conduct themselves with the utmost professionalism and always keep the public's trust in mind."

48.    The X post confirms that FWC terminated Plaintiff because her political commentary "made light of the assassination of Charlie Kirk" which was "not in line with the FWC['s] values". The FWC post confirms that this official agency action was taken by "FWC leadership".

49.    Defendants object to the content of Plaintiff's speech and the particular viewpoint expressed in her political statement.

50.    Defendants specifically object to the viewpoint expressed by Plaintiff: indifference to Mr. Kirk's killing. That viewpoint-based discrimination is demonstrated by the following:

A.    Defendants have not terminated anyone for publicly mourning Mr. Kirk's death.

B.    In its public statement, the FWC claimed that Plaintiff's post is "not in line" with the agency's "values".

51.    Defendants' actions here were based on their opposition to the content and viewpoint of Plaintiff's speech and not based on any good faith belief that Plaintiff's post would disrupt the ability of the FWC to function, upset its ability to deliver state services, or lead to dissension in the office. Plaintiff alleges the following particulars:

A.    No disruption occurred on the workdays following the time Plaintiff reposted on Instagram.

B.    Defendant Young apparently made his decision to terminate Plaintiff within hours of the Libs of TikTok post on a Sunday before the next workday commenced. As FWC publicly announced, "Upon learning of the social media post, FWC leadership took swift action." There was literally no opportunity for disruption to occur.

C.    Defendants' decision to terminate Plaintiff came at a time when none, or practically none, of Plaintiff's colleagues were even aware of the post.

D.    Because the post was made to Plaintiff's private Instagram account where she has a circumscribed group of followers and was set to disappear after 24 hours, it was extremely unlikely that more than a handful of her co-workers would ever have become aware of the post, but for Defendants' and Libs of TikTok's amplification of the issue.

E.    On information and belief, Plaintiff alleges that none of her co-workers complained about her post.

F.    Plaintiff continues to receive support and cordiality from her colleagues.

G.    Plaintiff has no supervisory responsibilities in her job position; she is a low-level employee.

H.    Plaintiff is a scientist, not a public information officer, and her primary job duties do not include regular interaction with the public on behalf of the FWC. Her natural constituency is birds; not human beings.

I.    FWC has no formal policies governing the private social media activities of its employees. While FWC does have policies governing the Internet and media posts, those policies do not address personal posts by FWC employees on

their own accounts. Instead, FWC's social media policies deal exclusively with the use of FWC's "Information Technology Resources"[13] and posts on the agency's own social media accounts.[14]

52.    Instead of supporting Plaintiff's First Amendment rights, and those of other dissenting individuals, Defendants rushed to capitulate to the Libs of TikTok heckler's veto and make a political example of Brown.

53.    Defendants' decision to terminate Plaintiff was based on objections to Plaintiff's speech. Plaintiff alleges the following particulars:

A.    Plaintiff was told of no other rationale for her termination or given an opportunity to discuss alternatives to termination.

B.    Plaintiff's political statement was brought to the attention of Defendants (and senior officials in the DeSantis administration) by way of a public

---

[13]    See "FWC Internal Management Policies and Procedures (IMPP)", https://impp.myfwc.com/3.7-Information-Technology-Resource-Usage-Policy.pdf (last accessed 9/30/25). Plaintiff did not make use of any public resources or facilities when making her private political post.

[14]    See "Social Media Comment Policy – Revised in 2023," https://myfwc.com/news/social/ (last accessed 9/30/25). The Social Media Comment Policy does not state that termination is a remedy for posts on FWC sites. Instead, the policy only states that improper posts are subject to FWC's "right to report, hide or delete submissions". Id. In any event, no social media policy for a public agency can limit the protections afforded by the First Amendment.

media campaign by a partisan individual wielding a particularly loud heckler's veto.

C.    The timing of Plaintiff's termination leaves no doubt that it was motivated purely in response to her political statement.

D.    Defendants nowhere claim that Plaintiff's political statement disrupted or had any potential to disrupt the FWC's ability to deliver services or effectively administer its programs.

E.    Even ignoring all of the foregoing facts, Defendants readily admit — and effectively brag — in their public statements that the firing was based exclusively on Plaintiff's speech.

54.    On information and belief, Defendants intended this termination to chill the future speech of all FWC employees by making a public example of Plaintiff.

55.    There is a direct causal connection between Plaintiff's political speech and Defendants' decision to terminate her employment; the timing and substance of the FWC press statements leave no doubt.

## ALLEGATIONS IN SUPPORT OF INJUNCTIVE RELIEF

56.    Plaintiff's free speech has been chilled now, and in the future, as she has been deprived of her very livelihood as a consequence of her speech.

57.    Unless the actions, policies, and practices of Defendants are enjoined by this Court, Plaintiff will suffer the continuing loss of her constitutional rights.

58.    Plaintiff has suffered irreparable injury and continues to suffer irreparable injury as a result of the Defendants' actions, policies, and practices.

59.    Plaintiff will continue to suffer the violation of her First Amendment rights unless and until she is restored to her employment and position at FWC.

60.    Plaintiff does not have a plain, adequate, or complete remedy to protect her constitutional rights and to redress the wrongs and illegal acts complained of, other than immediate and continuing injunctive relief.

61.    Plaintiff does not have an adequate remedy at law. Deprivation of rights guaranteed under the Constitution is an irreparable injury for purposes of injunctive relief. In cases involving the loss of First Amendment rights, such as in this case, monetary damages are inadequate.

62.    The public interest would be served by the granting of injunctive relief. In fact, the public interest is disserved by actions, such as those of Defendants, which interfere with the public's rights guaranteed under the First Amendment.

63.    A permanent injunction will preserve Plaintiff's civil rights and will minimize the need to award extensive compensatory damages.

## DAMAGES AND ATTORNEY'S FEES

64.    Because of Defendants' actions, Plaintiff's First and Fourteenth Amendment rights have been violated and Plaintiff is faced with similar and repeated

violations of her rights in the future.

65.    Plaintiff has suffered economic losses, including the lost income from employment she would have received but for her illegal and unconstitutional termination.

66.    Plaintiff has retained Benjamin, Aaronson, Edinger & Patanzo, P.A. and the American Civil Liberties Union Foundation of Florida, Inc. as her attorneys to represent her in this action. Defendants are obligated to pay Plaintiff's attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT I

### First Amendment Violation - Retaliation

### (Against Young)

67.    Plaintiff realleges the facts set forth in Paragraphs 1 through 66 and incorporate those facts into this Count by reference.

68.    This is an action for declaratory relief and injunctive relief brought by the Plaintiff against Young under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

69.    Plaintiff is uncertain as to her rights and remedies following the termination of her employment in apparent violation of the First Amendment to the United States Constitution.

70.    In posting the political comment concerning the death of Mr. Kirk, Plaintiff spoke as a private citizen.

71.    Plaintiff's comments concerning the death of Mr. Kirk addressed matters of public concern.

72.    Defendant Young took adverse action against Plaintiff — specifically her discharge from employment and the associated wages and benefits.

73.    Defendant Young had the actual authority to bring disciplinary charges against Plaintiff, including her discharge from employment.

74.    The termination notice ordered by Young and signed and executed by Tucker gave effect to and implemented the disciplinary action against Plaintiff.

75.    Defendant Young's actions directly deprived Plaintiff of her First Amendment rights.

76.    Defendant Young's adverse action was in direct response to Plaintiff's protected political speech.

77.    Plaintiff's political post was the motivating factor in Defendant Young's decision to take retaliatory action against Plaintiff. Defendant Young immediately terminated Plaintiff because of her private political comments on a matter of public importance.

78.    Defendant Young's response to Plaintiff's expression was sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

79.    Defendant Young's actions have chilled Plaintiff's speech.

80.    Defendant Young's actions were based on his objections to the content of Plaintiff's speech and the particular viewpoint expressed, all in direct retaliation for Plaintiff's speech.

81.    Defendant Young's decision to terminate Plaintiff's employment was motivated by FWC's opposition to Plaintiff's viewpoint, which the FWC labeled as contrary to its "values".

82.    Plaintiff is likely to succeed on the merits of her claims.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court take jurisdiction over the parties and this cause;

B.    That this Court enter a judgment declaring that Defendant Young's decision to terminate Plaintiff's employment violated the First Amendment because it was content-based;

C.    That this Court enter a judgment declaring that Defendant Young's decision to terminate Plaintiff's employment violated the First Amendment because it was viewpoint-based;

D.     That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her associated position and responsibilities;

E.     That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of FWC from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.     That this Court enter a judgment for benefits and credit for job seniority for any time after the FWC ceased to pay Plaintiff;

G.     That this Court enter a judgment for front pay in the event reinstatement is not granted;

H.     That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

I.     That this Court award Plaintiff nominal damages;

J.     That this Court award Plaintiff her recoverable costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988; and

K.     That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT II

## First Amendment Violation - Content and Viewpoint Discrimination
## (Against Young)

83.    Plaintiff realleges the facts set forth in Paragraphs 1 through 66 and incorporates those facts into this Count by reference.

84.    This is an action for declaratory relief and injunctive relief brought by the Plaintiff against Young under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

85.    Plaintiff is uncertain as to her rights and remedies following the termination of her employment in apparent violation of the First Amendment to the United States Constitution.

86.    In posting the political comment concerning the death of Mr. Kirk, Plaintiff spoke as a private citizen.

87.    Plaintiff's comments concerning the death of Mr. Kirk addressed matters of public concern.

88.    Plaintiff's interest in speaking as a private citizen on matters of public concern necessarily outweighs Defendants' interests in advancing content- or viewpoint-discrimination.

89.    Plaintiff's interest in speaking as a private citizen on matters of public concern outweighs Defendants' interest in content and viewpoint discrimination or imposing a heckler's veto.

90.    Defendant Young terminated Plaintiff's employment because of Defendant's opposition to the content of Plaintiff's political statement, or because of public reactions to Plaintiff's message, or both.

91.    Defendant Young never asserted that Plaintiff's political speech would upset the orderly operations of the FWC, nor were such disruptions reasonably foreseeable given the limited publication of Plaintiff's private speech, the lack of knowledge by her co-workers, Plaintiff's position and job responsibilities, and the content of Plaintiff's speech.

92.    Plaintiff's speech did not, in fact, disrupt FWC's operations.

93.    Public reaction to speech is never a content-neutral basis for regulation. See Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 134 (1992). A heckler's veto is a viewpoint-based limitation on expression and is impermissible under the First Amendment.

94.    The First Amendment prohibits government officials from discriminating against speech "based on the ideas or opinions it conveys." Iancu v. Brunetti, 139 S. Ct. 2294, 2299 (2019); see also Rosenberger v. Rector & Visitors

of Univ. of Va., 515 U.S. 819, 828–30 (1995) (action taken against a speaker because of "its message" is viewpoint discrimination). Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." Rosenberger, 515 U.S. at 829–30.

95.    Defendant Young's decision to terminate Plaintiff's employment is the product of viewpoint discrimination and is in retaliation for Plaintiff's speech.

96.    Defendant Young's decision to terminate Plaintiff's employment was motivated by FWC's opposition to Plaintiff's viewpoint, which the FWC labeled as contrary to its "values".

97.    Plaintiff is likely to succeed on the merits of her claims.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court take jurisdiction over the parties and this cause;

B.    That this Court enter a judgment declaring that Defendant Young's decision to terminate Plaintiff's employment violated the First Amendment because it was content-based;

C.    That this Court enter a judgment declaring that Defendant Young's decision to terminate Plaintiff's employment violated the First Amendment because it was viewpoint-based;

D.     That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her associated position and responsibilities;

E.     That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of FWC from disciplining in the future Plaintiff for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.      That this Court enter a judgment benefits and credit for job seniority for any time after the FWC ceased to pay Plaintiff;

G.     That this Court enter a judgment for front pay in the event reinstatement is not granted;

H.     That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

I.      That this Court award Plaintiff nominal damages;

J.      That this Court award Plaintiff her recoverable costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988; and

K.     That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT III

## First Amendment Violation - Content and Viewpoint Discrimination
### (Against Tucker)

98.    Plaintiff reallege the facts set forth in Paragraphs 1 through 55 and 64 through 66, and incorporate those facts into this Count by reference.

99.    This is an action for declaratory relief and injunctive relief brought by the Plaintiff against Defendant Tucker under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

100.   Plaintiff is uncertain as to her rights and remedies following the termination of her employment in apparent violation of the First Amendment to the United States Constitution.

101.   In posting the political comment concerning the death of Mr. Kirk, Plaintiff spoke as a private citizen.

102.   Plaintiff's comments concerning the death of Mr. Kirk addressed matters of public concern.

103.   Plaintiff's interest in speaking as a private citizen on matters of public concern necessarily outweighs the Defendants' interests in advancing content- or viewpoint-discrimination.

104.   Plaintiff's interest in speaking as a private citizen on matters of public concern outweighs the Defendants' interest in content and viewpoint discrimination or imposing a heckler's veto.

105.   Defendant Young terminated Plaintiff's employment because of Defendants' opposition to the content of Plaintiff's political statement, or because of public reactions to Plaintiff's message, or both.

106.   Defendant Young instructed Defendant Tucker to give effect to this decision to terminate the Plaintiff. In particular, Young instructed Tucker to prepare and execute a termination letter.

107.   Defendant Tucker is the ultimate supervisor of Plaintiff's division and the official who executed the decision to terminate Plaintiff.

108.   Tucker has actual knowledge that Plaintiff was being terminated solely because of objections to the content of her political post.

109.   Tucker has actual knowledge that Plaintiff was being terminated solely because of objections to the particular viewpoint expressed in her political post.

110.   Tucker shared Young's objections to the content of Plaintiff's speech and the viewpoint expressed in Plaintiff's post.

111.   The First Amendment prohibits government officials from discriminating against speech "based on the ideas or opinions it conveys." Iancu v.

Brunetti, 139 S. Ct. 2294, 2299 (2019); see also Rosenberger v. Rector & Visitors

of Univ. of Va., 515 U.S. 819, 828–30 (1995) (action taken against a speaker because

of "its message" is viewpoint discrimination). Viewpoint discrimination is an

"egregious form of content discrimination" and is "presumptively unconstitutional."

Rosenberger, 515 U.S. at 829–30.

112.    The law is clearly established that — where a public employee is

engaging in private public speech on a matter of public concern, and where no

disruption in government operations is shown — the government cannot terminate

or retaliate against the employee based on the content or viewpoint of their speech.

See, e.g., Travers v. Jones, 323 F.3d 1294, 1295–96 (11th Cir. 2003) ("The law is

clearly established that an employer may not demote or discharge a public employee

for engaging in protected speech.") (citing Rankin v. McPherson, 483 U.S. 378, 383

(1987).

113.    Even if the viewpoint-based discrimination at issue in this case does not

categorically preclude any claim for qualified immunity, the Pickering[15] balancing

would lead to the inevitable conclusion that Plaintiff's discharge was unlawful.

---

[15] Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois, 391 U.S.
563 (1968).

114.   Defendant Tucker intentionally violated Plaintiff's First and Fourteenth Amendment rights for discriminatory and retaliatory purposes.

115.   Tucker had actual knowledge or should have known that Young's instruction to terminate the Plaintiff in retaliation for her political speech was unlawful and in violation of Plaintiff's First Amendment rights.

116.   The termination notice ordered by Young and signed and executed by Tucker gave effect to and implemented the disciplinary action against Plaintiff.

117.   Defendant's decision to prepare, sign and execute the termination letter discharging Plaintiff from her employment is the product of viewpoint discrimination and is in retaliation for Plaintiff's speech.

118.   Plaintiff is likely to succeed on the merits of her claims.

WHEREFORE, Plaintiff prays for the following relief:

A.     That this Court take jurisdiction over the parties and this cause;

B.     That this Court enter a judgment declaring that Defendant Tucker's actions in preparing, signing, and executing the termination letter discharging Plaintiff from her employment violated the First Amendment because it was content-based;

C.     That this Court enter a judgment declaring that Defendant Tucker's actions in preparing, signing, and executing the termination letter discharging

Plaintiff from her employment violated the First Amendment because it was viewpoint-based;

D.    That this Court enter a judgment for back pay in amounts to be determined at trial, along with benefits and credit for job seniority for any time after the FWC ceased to pay Plaintiff;

E.    That this Court enter a judgment for front pay, in the event reinstatement is not granted;

F.    That this Court enter a judgement for pre-judgment and post-judgment interest at the highest lawful rate;

G.    That this Court award Plaintiff nominal damages;

H.    That this Court award compensatory damages in an amount to be determined at trial;

I.    That this Court award punitive damages against Tucker to deter the Defendant from violating Plaintiff's rights and other similarly situated employees in the future;

J.    That this Court award Plaintiff her recoverable costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988; and

K.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## **JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable as a matter of right.


/s/ Gary S. Edinger

| | |
|---|---|
| Caroline A. McNamara (FBN 1038312) | GARY S. EDINGER, Esquire |
| Michelle Morton (FBN 81975) | BENJAMIN, AARONSON, EDINGER |
| Samantha J. Past (FBN 1054519) | & PATANZO, P.A. |
| Daniel B. Tilley (FBN 102882) | Florida Bar No. 0606812 |
| ACLU FOUNDATION OF FLA. | 305 N.E. 1st Street |
| 4343 West Flagler Street, Suite 400 | Gainesville, Florida 32601 |
| Miami, FL 33134 | Tel.: (352) 338-4440 |
| Tel.: (786) 363-2714 | Fax.: (352) 337-0696 |
| cmcnamara@aclufl.org | GSEdinger12@gmail.com |
| mmorton@aclufl.org | |
| spast@aclufl.org | |
| dtilley@aclufl.org | |

*Attorneys for Plaintiff*

Page 37 of 37