UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

|  |  |  |
|---|---|---|
| **BRITTNEY BROWN**, | ) | |
| | ) | |
| | ) | CASE NO.: 4:25-cv-419 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **ROGER A. YOUNG** in his official capacity | ) | |
| as Executive Director of the Florida Fish | ) | |
| and Wildlife Conservation Commission, | ) | |
| and **MELISSA TUCKER**, | ) | |
| in her individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | / | |

# <u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff moves this Court to enter a preliminary injunction against Defendant Young on Count I of the Complaint, Dkt. No. 1 at 24–27, to prohibit Defendant Young from retaliating against her for engaging in First Amendment protected political speech and require Defendant Young to reinstate Plaintiff to her former position of employment.

## INTRODUCTION

The First Amendment protects speech of all kinds in every form, including posts to social media. See generally Brown v. Entertainment Merchants Ass'n, 564 U.S. 786, 790 (2011) ("[W]hatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears.") (citation omitted). That protection extends to even the most highly controversial, heretical, and provocative speech:

> Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and – as it did here – inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course – to protect even hurtful speech on public issues to ensure that we do not stifle public debate.

Snyder v. Phelps, 562 U.S. 443, 460–61 (2011). Only speech which falls into several extremely narrow and limited categories is outside the protection of the First Amendment. See generally United States v. Stevens, 559 U.S. 460, 468–69 (2010) (listing unprotected categories of speech); Counterman v. Colorado, 600 U.S. 66, 73–74 (2023) (same).

In this case, Plaintiff spoke on a topic of current public interest throughout the nation: the death of Charlie Kirk. Americans have widely diverging views of Mr. Kirk, as has been made apparent by the strong and conflicting reactions from millions of Americans in the weeks since his death. Plaintiff reposted a statement

from a satirical, whale-based Instagram account, which expressed a strong viewpoint

regarding this intrinsically political individual, but it did so in wry terms:

> [T]he whales are deeply saddened to learn of the shooting of charlie
> kirk, haha just kidding, they care exactly as much as charlie kirk cared
> about children being shot in their classrooms, which is to say, not at all.

Exhibit 1.[1] The Florida Fish and Wildlife Conservation Commission ("FWC")

viewed this post, attached as Exhibit 1 and referred to here as the "Whale Statement",

as "not in line with the FWC… values". Exhibit 5. But that sort of value-laden

judgment is reserved for this nation's people, not its government. Even hate-filled

speech is entitled to protection:

> Hate speech does not exist legally in America. There's ugly speech.
> There's gross speech. There's evil speech. And ALL of it is protected
> by the First Amendment. Keep America free.

Social media post by Charlie Kirk on May 2, 2024[2]; see also Snyder, 562 U.S. at

448, 458 (signs with messages such as "God Hates Fags" concerned an issue of

public concern and were protected speech).

---

[1] The post was originally made on the "awhalefact" Instagram site: https://www.instagram.com/awhalefact/. Plaintiff reposted that comment to her private Instagram story. Both the original post and Plaintiff's repost are no longer available on Instagram.

[2] https://x.com/charliekirk11/status/1786189687260103119 (last accessed 10/2/25).

## MATERIAL FACTS AND SUMMARY OF CLAIMS

1.    Plaintiff filed a Complaint under 42 U.S.C. §1983 asserting that the Defendants terminated her employment for content-based and viewpoint-based reasons, Dkt. No. 1, in retaliation for reposting the Whale Statement. Plaintiff's Complaint asserts that her firing violates the First Amendment under clearly established law.

2.    Plaintiff was employed by FWC for approximately seven years prior to her termination. Exhibit 2 ("Brown Decl.") ¶¶ 3, 49. She was a Biological Scientist III, Critical Wildlife Area Biologist principally tasked with studying and monitoring imperiled shorebirds and seabirds. Id. ¶ 4. She was an exemplary employee earning merit raises and an award from her statewide team. See id. ¶¶ 16, 39.

3.    Plaintiff reposted the Whale Statement to her private Instagram page on September 10, 2025.[3] See id. ¶¶ 22, 24. Apparently, a dissenting reader forwarded the statement and a screenshot of Plaintiff's LinkedIn profile to a social media user known as "Libs of TikTok". That social media user republished Plaintiff's statement on September 14, 2025, on x.com, along with a message calling for retaliation

---

[3] Private pages are accessible only to persons who follow the account and are not broadcast indiscriminately across the Internet.

against Plaintiff, including termination from her state job. See Exhibit 3[4]; see id. ¶ 31.

4.    Almost immediately after Plaintiff's repost appeared on the Libs of TikTok account, Defendants decided to terminate Plaintiff's employment. See id. ¶¶ 33–37. That decision is evident in the post made on FWC's social media on a Sunday evening:

> We've been made aware of an FWC employee's recent social media post and we do not condone nor tolerate this type of hateful sentiment. We're actively working towards a swift and immediate resolution regarding this individual's employment.

See Exhibit 4.[5]

5.    That statement was followed by another on Monday morning announcing that FWC had terminated Plaintiff in response to her post:

---

[4] https://x.com/libsoftiktok/status/1967254164876272097 (last accessed 10/2/25).

[5] https://x.com/MyFWC/status/1967356249022009566 (last accessed 10/2/25).



**MyFWC** ✓
@MyFWC                                                    ···

This weekend, we were made aware of a deeply troubling incident
involving an FWC employee who shared a social media post that made
light of the assassination of Charlie Kirk. The comments and actions of this
individual are not in line with the FWC, our values, or our mission. We have
a zero-tolerance policy towards the promotion of violence and hate, and
we will not stand for such behavior. Upon learning of the social media post,
FWC leadership took swift action, terminating the individual. We expect all
our employees to conduct themselves with the utmost professionalism and
always keep the public's trust in mind.

Exhibit 5.[6]

6.    Before FWC itself had posted its tweet publicly announcing Plaintiff's

termination, the Libs of TikTok account had already been informed and had already

shared that information on X, rejoicing in the outcome. Exhibit 6.[7]

7.    Plaintiff was formally terminated by letter dated September 15, 2025,

signed by Defendant Tucker and hand-delivered to Plaintiff's home. Dkt. No. 1-1.

## <u>MEMORANDUM OF LAW</u>

In order to obtain a preliminary injunction, a plaintiff must show the

following: (1) they have a substantial likelihood of success on the merits; (2)

irreparable injury will be suffered unless the injunction issues; (3) the threatened

---

[6] https://x.com/MyFWC/status/1967618398873084198 (last accessed 10/2/25).

[7] https://x.com/libsoftiktok/status/1967600668275003748 (last accessed 10/2/25).

injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. See Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1124 (11th Cir. 2022). Part I demonstrates that Plaintiff is likely to succeed on the merits. Part II covers the other injunction considerations.

## I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HER CLAIM.

### A. Plaintiff has standing and her claim is ripe.

Plaintiff has standing: she has suffered an injury-in-fact in her termination, that injury was caused by Defendants and can be redressed by this court. See Rankin v. McPherson, 483 U.S. 378, 383–84 (1987) (an at-will probationary employee "may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression"). The case is also ripe; Plaintiff has already been terminated for her speech, and the FWC termination letter itself notes that the decision is final and no administrative review is available. Dkt. No. 1-1.

### B. Defendant Young retaliated against Plaintiff based on protected speech in violation of her First and Fourteenth Amendment rights.

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). But neither is the right unlimited. If the speaker was acting as a government spokesperson or was speaking as part of their job duties or in the course of their

employment, the First Amendment affords no protection. See id. at 421 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). But where the public employee speaks as a citizen on a matter of public concern, the speech is protected. See id. at 417. In those circumstances, the Eleventh Circuit applies a four-step Pickering[8] balancing test to analyze public employee retaliation claims:

> To prevail under this analysis, an employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action. If an employee satisfies her burden on the first three steps, the burden then shifts to the employer [4] to show by a preponderance of the evidence that it would have been the same decision even in the absence of the protected speech.

O'Laughlin v. Palm Beach County, 30 F.4th 1045, 1051 (11th Cir. 2022) (alteration in original).

Here, Plaintiff's post was not "speech that owes its existence to [her] professional responsibilities," See Garcetti, 547 U.S. at 421. Plaintiff made her social media post on her personal phone while she was on vacation. Brown Decl. ¶¶ 22,

---

[8] Pickering v. Board of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Illinois, 391 U.S. 563 (1968).

24. That political post had nothing to do with Plaintiff's job responsibilities. After all, she is a wildlife biologist, not a public information officer. Id. ¶¶ 3–8. In addition, Plaintiff did not identify herself as an FWC employee in her post; the post itself had nothing to do with FWC or its operations; and her Instagram profile made no reference to FWC as her employer or otherwise. Id. ¶¶ 19, 22. For these reasons, Garcetti does not categorically bar her claims.

And while the political debate around the reactions to Mr. Kirk's killing has often involved allegations of condoning or even promoting violence, such rhetoric does not supplant First Amendment jurisprudence. See, e.g., Rankin, 483 U.S. at 381 (finding expression of hope for the success of a hypothetical future assassination attempt on President Reagan was protected). Regardless, Plaintiff's repost of an expression of indifference to Mr. Kirk's death and criticism of his political views neither condones, nor promotes violence. It certainly does not fall within any of the accepted free speech exceptions related to violence. See Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) (incitement requires advocacy of imminent lawless action likely to incite such action); Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942) (fighting words are those which "by their very utterance inflict injury or tend to incite an immediate breach of the peace"); Virginia v. Black, 538 U.S. 343, 359 (2003) (true threats require intentional conveyance of intent to commit unlawful violence).

Turning to the relevant analysis before the Court, under the four-factor Pickering balancing test as outlined by O'Laughlin, Plaintiff is substantially likely to prove each of the first three steps while Defendant Young at the fourth step cannot show he would have reached the same decision even if Plaintiff had never reposted the Whale Statement. This section first addresses step one of the Pickering test, then steps three and four together, followed by the balancing required under step two.

**(1)    Plaintiff spoke as a private citizen on a matter of public concern.**

Turning to whether her statement was on a matter of public concern, the appropriate inquiry is whether the employee "spoke primarily as a citizen on behalf of the public or primarily as an employee upon matters of personal interest." Maggio v. Sipple, 211 F.3d 1346, 1352 (11th Cir. 2000) (citing Connick v. Myers, 461 U.S. 138, 147 (1983)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147–48. What qualifies as a matter of "public concern" is broadly construed, reaching "any matter of political, social, or other concern to the community," rather than that of pure "personal interest." Id. at 146–47; see also Maggio, 211 F.3d at 1351–52 (11th Cir. 2000) (quoting Connick for same definition of "public concern"). Plaintiff need only

establish that her speech may be "fairly characterized" as addressing matters of

public concern. <u>Connick</u>, 461 U.S. at 146.[9]

    Plaintiff's repost of the Whale Statement expressed a personal opinion about

a topic – the death of Charlie Kirk – that is actively being discussed in the halls of

power as well as in living rooms across the country. <u>See</u> Brown Decl. ¶¶ 23, 25.

There is no question that Plaintiff spoke on a matter of public concern. She spoke on

an issue that has captivated the nation and is still the topic of discussion today. Not

only is commentary about Mr. Kirk a matter of public concern, but also the public

dialogue has expanded to encompass discussions concerning the fallout of that

debate, including firings of employees for criticizing Mr. Kirk or his ideology.[10]

    Plaintiff's political commentary contributed to the public debate over various

aspects of Mr. Kirk's life and legacy. Plaintiff's statement was not just a response to

his death but a comment about his alleged views on gun violence. Even if Plaintiff's

statement were deemed non-political, it addressed matters of broad societal concern

---

[9] "The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." <u>Rankin</u>, 483 U.S. at 387.

[10] <u>See, e.g.</u>, New York Times, <u>A Broad Wave of Firings Followed Charlie Kirk's Assassination</u>, 9/26/25, https://www.nytimes.com/2025/09/26/us/kirk-critics-fired-free-speech.html (last accessed 10/2/25).

that fall well within the universe of concerns the Supreme Court has recognized as

socially important:

> While these messages may fall short of refined social or political
> commentary, the issues they highlight – the political and moral conduct
> of the United States and its citizens, the fate of our Nation,
> homosexuality in the military, and scandals involving the Catholic
> clergy – are matters of public import.

Snyder, 562 U.S. at 454. Accordingly, her speech is presumptively protected by the

First Amendment.

    **(2)    Not only was Plaintiff's repost of the Whale Statement a "substantial part" of Defendant Young's decision to terminate her employment, it was also the but-for cause.**

Plaintiff bears the burden to show her protected speech played a substantial

part in Defendant Young's decision to terminate her employment, which then shifts

the burden to Defendant Young to prove he would have made the same decision

even in the absence of Plaintiff's speech. O'Laughlin, 30 F.4th at 1051.

Contemporaneous public statements posted to FWC's official x.com account make

clear that Plaintiff's repost of the Whale Statement was the direct cause and sole

reason for Defendant Young's termination of Plaintiff's employment. Almost

immediately after Plaintiff's repost appeared on the Libs of TikTok account on

Sunday morning, Exhibit 3, Defendant Young decided to terminate Plaintiff's

employment. That decision is evident in the post made on FWC's social media on

Sunday evening, which declared that FWC "do[es] not condone nor tolerate this type

of hateful sentiment" and is "actively working towards a swift and immediate resolution regarding this individual's employment." Exhibit 4. The very next morning, another FWC post confirmed that "[u]pon learning of" Plaintiff's repost, "FWC leadership took swift action, terminating the individual" because she violated a purported "zero-tolerance policy toward the promotion of violence and hate". Exhibit 5; compare Brown v. City of Tulsa, 124 F.4th 1251, 1259–60, 1270–71 (10th Cir. 2025) (Police officer alleged a plausible First Amendment retaliation claim based on termination for social media posts where city terminated him just one hour and 15 minutes after being notified of posts, the city publicized its decision to media, and there were no disruptions to department's internal operations). Libs of TikTok swiftly posted a statement on X celebrating Plaintiff's termination and encouraging the termination of others with similar viewpoints. Exhibit 6.

FWC's invocation of a "zero-tolerance policy" lays bare that Defendant Young had no basis to terminate Plaintiff except her repost of the Whale Statement. Invoking solely a zero-tolerance policy means nothing else in Plaintiff's record mattered to the decision. And Plaintiff's termination letter provided no other reason for her termination. Dkt. No. 1-1. Plaintiff disputes whether such a "zero-tolerance policy toward the promotion of violence and hate" actually exists; and even if it does, her repost of the Whale Statement was not "promoting violence and hate". Furthermore, Defendant Young's burden would be greater if defending reliance on

general policy. He would have to show that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." United States v. Nat Treas. Emps. Union (NTEU), 513 U.S. 454, 468 (1995) (quoting Pickering, 391 U.S. at 571).

Regardless of the accuracy of the FWC statement, Plaintiff's repost was the sole cause of Defendant Young's decision to terminate Plaintiff's employment. Defendants gave neither her, nor the public, any other reason. Brown Decl. ¶¶ 34–38; Exhibits 4–5; Dkt. No. 1-1. Plaintiff is therefore likely to succeed at both the third and fourth steps of the Pickering balancing test. See O'Laughlin, 30 F.4th at 1051.

> **(3)    Plaintiff's Private Speech Did Not Cause Disruption in FWC Operations, Nor Could Such Disruptions Be Reasonably Anticipated.**

The second step of the Pickering test, as outlined in O'Laughlin, balances the public employer's interests in maintaining good order against the public employee's First Amendment right to speak. "If . . . the speech does involve a matter of public concern, the government bears the burden of justifying its adverse employment action." NTEU, 513 U.S. at 466. That is not a trivial burden, as this Court recently outlined. First, under Pickering, "this Court may consider whether Plaintiffs' speech would impair discipline by superiors or harmony among co-workers, have a

detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede the performance of the speaker's duties or interfere with the regular operation of the enterprise." Austin v. Univ. of Fla. Bd. of Trs., 580 F. Supp. 3d 1137, 1171 (N.D. Fla. 2022) (quoting Rankin, 483 U.S. at 388) (citation modified), vacated as moot, 2023 WL 5051221, at *1 (11th Cir. Mar. 20, 2023). Second, "a stronger showing of government interests may be necessary if the employee's speech more substantially involves matters of public concern." Id. at 1171 (quoting Lane v. Franks, 573 U.S. 228, 242 (2014)) (citation modified). "Finally, this Court is mindful of Justice Alito's warning that '[n]othing in the Pickering line of cases requires us to uphold every speech restriction the government imposes as an employer.'" Id. at 1171 (quoting Janus v. Am. Fed. of State, Cnty., and Mun. Emps., Council 31, 585 U.S. 878, 916 (2018)).

Plaintiff's speech "more substantially" involved matters of public concern, Lane, 573 U.S. at 242. Specifically, she was contributing her personal viewpoints on a topic that was hotly discussed from the dinner table to the floor of Congress. Defendants face a heavier burden to show that her right to repost an expression of indifference to the death of a controversial political figure outweighed the FWC's legitimate interests. Because her speech "more substantially" involved a matter of public concern, a stronger showing of government interests may be necessary." Id. (alterations omitted).

The public statements from FWC providing the rationale for her termination identified only a perceived misalignment between the agency's purported values and Plaintiff's repost of the Whale Statement. Exhibits 4–5; Dkt. No. 1-1. Such concerns are irrelevant to Plaintiff's shorebird conservancy role and cannot provide a legitimate interest in <u>Pickering</u> balancing. A recent Eleventh Circuit decision makes clear that retaliation based on an irrelevant ideological concern is "completely out of bounds." <u>Oakes Farms Food & Distrib. Servs., LLC v. Adkins</u>, --- F.4th ---, 2025 WL 2658447, at *7 (11th Cir. Sept. 17, 2025). In <u>Oakes Farms</u>, the court rejected a retaliation claim against a school district that terminated a food-service contract where there was "no shortage of evidence that student safety drove" the decision, but clarified that the district court erred in relying on a perceived contradiction between the contractor's speech and the district's messages of inclusion and anti-racism – "a concern that is plainly irrelevant to his company's food-services role." <u>Id.</u> <u>Oakes Farms</u> explicitly cautions, "if there *were* evidence of retaliation against Oakes because of his views on Black Lives Matter or George Floyd, that would be completely out of bounds." <u>Id.</u> (emphasis in original).

Defendant Young cannot rely on an interest in imposing "values" related to the proper way to speak about Mr. Kirk's death on FWC employees. <u>See</u> <u>W. Va. State Bd. of Educ. v. Barnette</u>, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe

what shall be orthodox in politics, nationalism, religion, or other matters of opinion."). The government's interests as employer do not support requiring lockstep agreement with all political views of leadership. Defendant Young cannot choose a side in the political debate over Mr. Kirk's legacy and dictate what beliefs FWC employees may express about him. "The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate." Rutan v. Republican Party of Ill., 497 U.S. 62, 76 (1990). Attempting to enforce a particular view, namely mourning Mr. Kirk's death, on its employees would represent a particularly virulent or egregious form of content-based discrimination. See Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828–829 (1995); Matal v. Tam, 582 U.S. 218, 243 (2017); see also Honeyfund.com Inc. v. Gov. of Fla., 94 F.4th 1272, 1277 (11th Cir. 2024) ("[B]y barring only speech that endorses any of those ideas, it penalizes certain viewpoints – the greatest First Amendment sin.").

Nor can Defendant Young justify this termination on a purported interest to avoid public backlash to Plaintiff's speech or minimize the impact of Libs of TikTok's public demand for Plaintiff to be fired. "Speech cannot be . . . punished or banned[] simply because it might offend a hostile mob." Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 134–35 (1992). Oakes Farms specifically rejected the idea

that "protests, and even the threat of protests, weigh in favor of the government's legitimate interest in avoiding disruption" when applying <u>Pickering</u> balancing, finding that, "[t]his kind of heckler's veto concern is not enough to survive First Amendment scrutiny." --- F.4th ---, 2025 WL 2658447, at *7 (citation modified) (noting it would have been improper if school district had based its decision to terminate its contract with Oakes Farms on the public outcry over Oakes Farms' disparaging remarks about the recently killed George Floyd.); <u>accord</u> <u>Melton v. City of Forest City, Ark.</u>, 147 F.4th 896, 903 (8th Cir. 2025) (social media post depicting fetus with noose and the phrase "I can't breathe" in the aftermath of George Floyd killing could not serve as basis to terminate firefighter where "the evidence of disruption is thin" and "there was no showing that Melton's post had an impact on the fire department itself"); <u>Watters v. City of Phila.</u>, 55 F.3d 886, 897 (3d Cir. 1995) ("[D]isruption caused by actions independent of the speech at issue cannot be equated with disruption caused by the speech itself."); <u>Flanagan v. Munger</u>, 890 F.2d 1557, 1566 (10th Cir. 1989) ("reaction by offended members of the public" insufficient to satisfy <u>Pickering</u> balancing); <u>Berger v. Battaglia</u>, 779 F.2d 992, 1001 (4th Cir. 1985) (holding disruption "caused not by the speech itself but by threatened reaction to it by offended segments of the public" cannot satisfy <u>Pickering</u>); <u>see also</u> <u>Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.</u>, 513 F. Supp. 3d 593, 616 (W.D. Pa. 2021) (collecting cases supporting the notion that "under

Pickering, threatened disruption by others as a result of speech may not serve as a justification for public employer discipline at all") (citation modified).

Plaintiff's decision to repost the Whale Statement on social media does not convert public reaction by other social media users into a valid government interest to support Defendant Young's decision to terminate her employment. That is demonstrated by Oakes Farms and Melton above, but as a Tennessee district court summed it up well: "The fear of 'going viral,' by itself, does not appear to be a reasonable justification for a restriction on an employee's speech. To hold otherwise would permit the government to censor certain viewpoints based on the whims of the public – or, worse, based on a government official's speculation as to the public's eventual reaction." Goza v. Memphis Light, Gas & Water Div., 398 F. Supp. 3d 303, 321 (W.D. Tenn. 2019) (citing Liverman v. City of Petersburg, 844 F.3d 400, 414 (4th Cir. 2016) ("The advent of social media does not ... provide a pretext for shutting off meaningful discussion of larger public issues in this new public sphere.")).

Defendant Young did not and could not now reasonably predict that Plaintiff's repost of the Whale Statement would disrupt FWC's fulfillment of its mission to

manage fish and wildlife resources.[11] He cannot show that Plaintiff's repost would impede her performance of her duties as a Biological Scientist III, which include collecting and analyzing data on shorebirds and seabirds and writing reports. Brown Decl. at ¶¶ 3–8. She is not in a position of authority, media relations, or policymaking. Her personal, political views on school shootings and a political figure's death are wholly irrelevant to her job duties. See, e.g., Rankin, 483 U.S. at 381 (clerical employee of county constable could not be terminated for the statement "if they go for him again, I hope they get him" in response to news coverage of assassination attempt on U.S. president). Likewise, there is no evidence that her post impaired the ability of her supervisors to manage her, sowed disharmony among her co-workers, or had a detrimental impact on close working relationships requiring personal loyalty and confidence. Instead, there is evidence that her supervisors and colleagues continue to support her. Brown Decl. ¶¶ 38–40. Defendant Young cannot meet his heavy burden by relying on Internet trolls and fleeting social media outrage. And the unambiguous public statements by the FWC and the immediate action taken against Plaintiff – before the workweek even started – show that disruption was the

---

[11] Florida Fish and Wildlife Conservation Commission, FWC Mission, Vision and Values, https://myfwc.com/strategic-planning/mission-vision-values/ (last accessed 10/2/25).

last thing on Defendants' minds. Exhibits 4–5; Dkt. No. 1-1. There is not even a hint of a whisper of a suggestion in the public statements that the decision was motivated out of any other interest. Instead, Defendants were focused entirely on the need to retaliate against Plaintiff because of her political speech.

### C. The Injunction in <u>Hook v. Rave</u> should Guide this Court's Decision.

Although it has been only a matter of weeks since Mr. Kirk's death, this Court is not without guidance as to how the First Amendment applies to posts by public employees commenting on him. In <u>Hook v. Rave,</u> No. 4:25-cv-04188, 2025 WL 2720978 (D.S.D. Sept. 24, 2025),[12] an art professor at a public university was suspended and required to attend a hearing where his termination was to be finalized. That action was taken in response to a social media post with none of the satire which characterized Ms. Brown's statement:

> Okay. I don't give a flying f*** about this Kirk person. Apparently he was a hate spreading Nazi. I wasn't paying close enough attention to the idiotic right fringe to even know who he was. I'm sorry for his family that he was a hate spreading Nazi and got killed. I'm sure they deserved better. Maybe good people could now enter their lives. But geez, where was all this concern when the politicians in Minnesota were shot? And the school shootings? And Capitol Police? I have no thoughts or prayers for this hate spreading Nazi. A shrug, maybe.

---

[12] A Westlaw search on October 2, 2025, found no other reported cases involving Charlie Kirk commentary in either the state or Federal courts.

Id. at *1. While certainly expressing a political opinion, Mr. Hook's statement called

Mr. Kirk a Nazi, specifically invoked hate speech as justification for the death, and

employed profanity.

To say that the professor's speech drew some public attention would be quite

the understatement. South Dakota's Governor directly commented on the post and

cheered on the decision by the Board of Regents to fire Hook:

> When I read this post, I was shaking mad. The Board of Regents intends
> to FIRE this University of South Dakota professor, and I'm glad.
>
> This individual stands in front of South Dakota students to educate
> them. We must not send the message to our kids that this is acceptable
> public discourse.
>
> We need more Charlie Kirks on campus and less hatred like this.

Id. at *2.

The District Court had no difficulty in concluding that the plaintiff spoke in a

private capacity on a matter of public concern. Id. at *3-4. The Court cited to Snyder

for the proposition that the "inappropriate or controversial character of a statement

is irrelevant to the question whether it deals with a matter of public concern." Id. at

*3. The Court then moved immediately to consideration of whether the very public

nature of this post and the attention it garnered was disruptive of the university

environment:

> At this stage, defendants have failed to put on evidence that Hook's
> "speech had an adverse impact on the efficiency of the [University's]
> operations." Mayfield, 122 F.4th at 1053. Defendants allege that in the

days following Hook's post, "hundreds of calls and message were made to the Board of Regents and/or the University of South Dakota commenting negatively regarding the comment or calling for the removal of Professor Hook." Docket 9 at 4. But "[m]ere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient." Lindsey, 491 F.3d at 899; see also Melton v. City of Forrest City, Ark., 147 F.4th 896, 903 (8th Cir. 2025) (finding insufficient evidence of disruption where defendants only alleged that "'several' police officers and city-council members were upset and 'phone lines [were] jammed' with calls from concerned citizens"). Defendants have not demonstrated that there was any disruption to on-campus activities, Hook's teaching lessons, or the University's operations. And without more, "such 'vague and conclusory' concerns ... runs the risk of constitutionalizing a heckler's veto." Melton, 147 F.4th at 903 (quoting Sexton v. Martin, 210 F.3d 905, 912 (8th Cir. 2000)). Thus, because defendants have failed to demonstrate any evidence of disruption, the court need not consider the Pickering factors at this stage. See id. at 903; Mayfield, 122 F.4th at 1055.

The court last concludes that defendants took an adverse employment action against Hook and that Hook's speech was the "substantial or motivating factor" in defendants' decision to place Hook on administrative leave and notify him of their intention to fire him.

Id. at *4. The Court entered a temporary restraining order directing the university to lift the plaintiff's suspension and restore him to his position as a professor. Id. at *6.

Hook presented more extreme factual circumstance than here. Mr. Hook posted a vulgar message comparing Mr. Kirk to Hitler. Ms. Brown reposted a political message reflecting a position of nonchalance from the perspective of an anthropomorphized whale. If Mr. Hook's posts cannot be considered disruptive, Ms. Brown's comments cannot be punished in this case. This Court should adopt the

rationale in <u>Hook</u> and enter a comparable injunction restoring Plaintiff to her position during the course of this litigation.

## II.    THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFF.

No lengthy argument on the other three injunction factors is necessary. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" justifying injunctive relief. <u>KH Outdoor, LLC v. City of Trussville</u>, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (quotations omitted); <u>see also</u> <u>FF Cosmetics FL, Inc. v. City of Miami Beach</u>, 866 F.3d 1290, 1298 (11th Cir. 2017) ("[A]n ongoing violation of the First Amendment constitutes an irreparable injury.").

In addition, "[t]he last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public. Where the government is the party opposing the preliminary injunction, its interest and harm – the third and fourth elements – merge with the public interest." <u>State of Fla. v. Dep't of Health & Hum. Servs.</u>, 19 F.4th 1271, 1293 (11th Cir. 2021). And here, the public-interest question is easy, for "the public interest is served when constitutional rights are protected." <u>Democratic Exec. Comm. of Fla. v. Lee</u>, 915 F.3d 1312, 1327 (11th Cir. 2019).

Finally, the bond requirement should be waived because this is a matter within the Court's discretion and the equities mitigate against imposition of a bond. "[I]t is well-established that the amount of security required by the rule is a matter within the discretion of the trial court, and the court may elect to require no security at all." BellSouth Telecomms. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 971 (11th Cir. 2005) (citation modified) (finding no abuse of discretion in district-court decision declining to set a bond); see also Fla. v. Mayorkas, 672 F. Supp. 3d 1206, 1215 (N.D. Fla. 2023) ("Here, Defendants do not identify any monetary costs or damages they might suffer if the new parole policy is temporarily enjoined, so the Court sees no reason to impose a bond as a condition of the TRO."); Computer & Commc'ns Indus. Ass'n v. Uthmeier, No. 4:24-cv-438, --- F. Supp. 3d ---, 2025 WL 1570007, at *20 (N.D. Fla. June 3, 2025) ("[W]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right. Here, considering that the challenged law's unlawful impact on Plaintiffs' and youth's First Amendment rights weighs against requiring a bond, this Court waives the bond requirement.") (citation and internal quotation marks omitted).

## **CONCLUSION**

The Supreme Court "has many times held, in many contexts, that it is no job for government to decide what counts as the right balance of private expression – to

'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences." <u>Moody v. NetChoice, LLC</u>, 603 U.S. 707, 719 (2024). In this case, Defendants terminated Ms. Brown for her political comments because they objected to what she said on a topic of vital public interest. In doing so, Defendants violated Plaintiff's First Amendment rights.

For these reasons, Plaintiff moves for entry of a preliminary injunction enjoining Defendant Young from retaliating against her for posting her Whale Statement and requiring Defendant Young to reinstate her employment on the same terms and conditions as she enjoyed prior to her unconstitutional termination.

Respectfully submitted October 3, 2025,

/s/ Caroline A. McNamara          /s/ Gary S. Edinger
AMERICAN CIVIL LIBERTIES         BENJAMIN, AARONSON, EDINGER
FOUNDATION OF FLORIDA, INC.      & PATANZO, P.A.
CAROLINE A. MCNAMARA             GARY S. EDINGER, Esquire
Florida Bar No. 1038312          Florida Bar No. 0606812
DANIEL B. TILLEY                 305 N.E. 1st Street
Florida Bar No. 102882           Gainesville, Florida 32601
MICHELLE MORTON                  (352) 338-4440  (Fax) (352) 337-0696
Florida Bar No. 81975            GSEdinger12@gmail.com
SAMANTHA J. PAST
Florida Bar No. 1054519
4343 W Flagler Street, Ste 400
Miami, Florida 33134-1585
(786) 363-2738
CMcNamara@aclufl.org
dtilley@aclufl.org
mmorton@aclufl.org
spast@aclufl.org

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

This Motion complies with the type-volume limitation of Rule 7.1(F), N.D. Fla. Loc. R. This Motion and Memorandum contain 5,749 words, excluding the parts of the Motion exempted by Rule 7.1(F).