UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**BRITTNEY BROWN**,

Plaintiff,

vs.

**ROGER A. YOUNG** in his official capacity as Executive Director of the Florida Fish and Wildlife Conservation Commission, and **MELISSA TUCKER**, in her individual capacity,

Defendants.

CASE NO.: 4:25-cv-419

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Brittney Brown moves the Court to enter summary judgment on all three counts of the Complaint, ECF 1, and grant the legal and equitable relief requested, including declaratory relief, reinstatement, and damages.

## SUMMARY OF ARGUMENT

The Florida Fish and Wildlife Conservation Commission ("FWC") fired Brittney Brown for daring to criticize Charlie Kirk's politics on the day he was killed. She was an at-will ("OPS") employee who could be tossed aside to send a message to all FWC staff: either praise Charlie Kirk or keep your mouth shut.

The First Amendment does not tolerate viewpoint-based discrimination of that kind and neither do the courts. The test announced in *Pickering v. Board of Education*, 391 U.S. 563 (1968), will decide this case. The outcome of that test is clear: because there was no actual or reasonably foreseeable disruption to FWC operations, Brown's right to engage in political speech on a matter of public importance must carry the day.

The Court declined to order Plaintiff's reinstatement in November for one reason: Defendant Melissa Tucker submitted a sworn Declaration stating that Brown's political expression disrupted FWC operations through hundreds of documented complaints, forcing FWC to fire Plaintiff immediately lest FWC's scientific mission collapse under the weight of one satirical meme. ECF 21-1. Really? Plaintiff lacked evidence to contest that affidavit at the time, but now the truth has been revealed: Defendant Tucker swore a false oath. Agency operations continued just as before, with approximately 50 documented complaints, which the decision-makers ignored. To make matters worse, Tucker had no personal knowledge whatsoever concerning any of the key averments.

The evidentiary record from FWC is a smoldering crater once Tucker's Declaration implodes. All material evidence reinforces one conclusion: Defendant Young terminated Plaintiff because of her speech and the viewpoint she expressed. Defendant Tucker was complicit as she actually signed the termination letter and

arranged for its personal delivery. Defendants acted quickly over a weekend without consulting legal counsel, instead turning to social media to excoriate Plaintiff for her post. Defendants did all this to chill Plaintiff's and other FWC employees' speech. Indeed, two additional FWC employees were soon terminated for similar posts. These firings had nothing to do with the efficient operation of FWC. This was all politics.

FWC has intentionally exacerbated Plaintiff's injuries by litigating in bad faith, as well as interfering with Plaintiff's reputation within a tiny professional community, precluding her future employment in Florida and likely beyond. Even now, after the full evidentiary record shines a spotlight on Defendants' perfidy, FWC still refuses to admit wrongdoing.

Plaintiff should never have lost her job for her constitutionally protected political speech. She must be reinstated immediately, and Defendant Tucker must be held personally liable for the suffering she has caused with her false oath. FWC must face judgment, both because the evidentiary record compels it, and because their bad faith litigation conduct has prolonged and deepened Plaintiff's injuries. This court should award her punitive damages to discourage future misconduct by the Defendants.

## **PROCEDURAL HISTORY**

Plaintiff filed the Complaint on September 30, 2025, ECF 1, then moved for

preliminary injunctive relief on October 3, ECF 8. The Court held oral argument on that motion on November 10, ECF 23, and denied the motion on November 13, ECF 26. Shortly after the November 10 hearing, the Court issued an Initial Scheduling Order, ECF 24, to commence discovery immediately through January 30, 2026.

Plaintiff engaged in extensive written discovery and deposed all of those FWC personnel with any knowledge of the dispute. ECF 34; ECF 41; ECF 42-1; ECF 42-2; ECF 42-3; ECF 42-4; ECF 42-5; ECF 42-6; ECF 42-7; ECF 42-8; ECF 42-9. The parties completed discovery on time. ECF 41.

Defendants moved to dismiss the Complaint, ECF 29, which the Court substantially denied on December 16, ECF 33. Defendants Answered the Complaint on January 23. ECF 35. The parties mediated on February 11. ECF 40. The pretrial conference is scheduled for May 19 and jury trial June 15, 2026. ECF 38.

## STATEMENT OF UNDISPUTED FACTS

### I. PLAINTIFF'S ROLE AT FWC

Brittney Brown is a biologist who specializes in shorebirds and seabirds. ECF 8-2 ¶ 9. She graduated in 2012, *cum laude*, with a Bachelor of Science in Fisheries, Wildlife, & Conservation Biology and a minor in Biological Sciences from North Carolina State University. ECF 8-2 ¶ 2. In March 2018, FWC hired Plaintiff as a part-time Fisheries & Wildlife Biological Scientist I, through August 2018. ECF 8-2 ¶ 3. Because of her success in that role, in November 2018, FWC hired Plaintiff as

a full-time Fisheries & Wildlife Biological Scientist III, Critical Wildlife Area Biologist ("Biological Scientist III") based in Panama City. ECF 8-2 ¶ 3. She held that position until September 15, 2025, when FWC terminated her employment. ECF 8-2 ¶ 3; ECF 42-3 ¶¶ 1, 2; ECF 42-4 ¶¶ 1, 5, 6.

As a Biological Scientist III, Brown worked with partner organizations to collect shorebird data used for management decisions. ECF 42-6 at 55:16–:20; ECF 42-11. Brown's duties were field-focused and intensive during the shorebird nesting season from February to September, with more office, administrative work, and preparatory tasks when the shorebirds were not nesting. ECF 42-13 ¶ 5. Brown worked with three external "partners": Audubon Florida, U.S. Department of Defense, and Florida Department of Environmental Protection. ECF 42-6 at 56:9–57:11.

As director of FWC's Division of Habitat and Species Conservation, Defendant Tucker oversaw the work of nearly six hundred employees, including Plaintiff. ECF 42-6 at 17:1–18:1, 19:8–:13; ECF 42-18; ECF 42-19. She did not regularly interact with Plaintiff and was not intimately familiar with her role. ECF 42-6 at 53:25–54:11, 58:15–:23, 60:16–:21, 61:2–:11.

During her employment with FWC, Plaintiff received regular performance-based raises. ECF 8-2 ¶ 15; ECF 42-13 ¶ 17. An internal memorandum describes Plaintiff's work as "effectively fill[ing] a crucial role for the shorebird team", "a

critical role in the training of the new staff", and "go[ing] above and beyond when it comes to shorebird conservation despite often demanding conditions." ECF 42-6 at 63:21–64:13; ECF 42-12 at 2. The FWC statewide shorebird team awarded Plaintiff the "Got Your Back Award" in 2024; even after she was terminated, her colleagues nominated her for the FWC Division of Habitat and Species Conservation's "Purveyor of Awesomeness Award" for 2025. ECF 8-2 ¶¶ 16, 39; ECF 42-6 at 67:7–68:5, 68:20–69:15; ECF 42-10.

FWC classified Plaintiff's position as Other Personal Services ("OPS") employment, which is an at-will position. ECF 42-6 at 19:16–21:1; ECF 42-9 at 17:6–18:21; ECF 42-11. FWC acknowledged that OPS employees have the same First Amendment rights as permanent employees. ECF 42-5 at 22:16–23:10; ECF 42-9 at 18:14–:21.

## II. Plaintiff's Speech

Brown used Instagram to share her own photography as well as memes and social and political commentary. ECF 8-2 ¶ 20. Plaintiff did not identify herself as an FWC employee on her Instagram profile, and she never represented FWC on Instagram. ECF 8-2 ¶ 19. Earlier in 2025 she set her account visibility to private to prevent access to any new followers without her approval. ECF 8-2 ¶ 19.

Brown was on vacation outside Florida when she reposted the Whale Statement. ECF 42-3 ¶ 7. The Shorebird season ends in September, so Plaintiff was

able to plan a vacation during the second week of September. ECF 42-6 at 71:17–:20; ECF 42-9 at 57:5–58:10; ECF 42-13 ¶¶ 5–6. During her vacation, the evening of September 10 a friend told her of the news that Charlie Kirk had been shot. ECF 42-13 ¶ 6.

Later that night, Plaintiff reviewed the events of the day on her personal phone, including Charlie Kirk's death and an unrelated school shooting in Evergreen, Colorado. ECF 42-13 ¶ 7. Plaintiff then shared a satirical Instagram post from user @awhalefact, to express the political criticism of Kirk's public advocacy for gun rights and indifference to victims of school shootings. ECF 8-1 (the "Whale Statement"); ECF 8-2 ¶¶ 22–23. The Whale Statement reads as follows:

> "the whales are deeply saddened to learn of the shooting of charlie kirk, haha just kidding, they care exactly as much as charlie kirk cared about children being shot in their classrooms, which is to say, not at all"

ECF 8-1. She shared the Whale Statement with her followers through her "stories", a feature of Instagram that allows users to post images to their followers that disappear after 24 hours. ECF 8-2 ¶ 24.

On Sunday, September 14, she first learned of negative reaction to her repost through a friend who had seen images of the Whale Statement and Plaintiff's LinkedIn profile on a local Facebook group. ECF 8-2 ¶ 29. She also learned from another friend that Libs of TikTok had posted the same image on x.com, linking Plaintiff's personal Instagram account to her FWC employment, calling her repost

"disgusting," and demanding Plaintiff "should be fired ASAP." ECF 8-2 ¶ 31; ECF 8-3.

Plaintiff responded Sunday evening by temporarily deactivating her Instagram account. ECF 8-2 ¶ 29. She also deleted her LinkedIn account, which she had not used since being hired full time at FWC in 2018. ECF 8-2 ¶¶ 18, 29. Brown reached out to her section leader, Sundquist Blunden, who advised Plaintiff she had not violated any FWC policies. ECF 8-2 ¶ 30; ECF 42-9 at 58:2–:10; ECF 42-19.

## III. Defendants' Reaction to Brown's Speech

### A. *FWC Actions Before the Decision*

Young discovered the Whale Statement linked on social media to FWC at 9:00 p.m. Saturday night September 13, while he and his wife watched the Florida-LSU football game.[1] ECF 42-1 at 3; ECF 42-5 at 7:9–9:10; ECF 42-9 at 32:11–33:10; ECF 42-8 at 14:13–15:10, 16:11–16:20. An hour earlier, Libs of TikTok had emailed media@myfwc.com the Whale Statement juxtaposed beside Plaintiff's LinkedIn profile naming FWC. ECF 42-9 at 58:11–59:20; ECF 42-14. Young, who had never met Plaintiff, called Warthen and asked him to confirm her employment and involvement. ECF 42-5 at 6:25–7:2, 9:11–11:2, 11:9–12:2; ECF 42-8 at 14:5–15:10, 16:11–16:20. Later that night, Warthen called Young back to confirm her

[1] This motion uses Eastern Time Zone for consistency despite some key events occurring in Panama City within the Central Time Zone.

employment in Tucker's division and suggested that she might be OPS. ECF 42-5 at 10:11–11:2. Young consulted with Warthen, who provided information but no opinion; the ultimate decision to terminate Brown was made by Young. ECF 42-5 at 11:9–12:2, 21:10–22:15; ECF 42-8 at 20:4–:16, 34:10–:14.

At 10:48 a.m. on the morning of Sunday, September 14th, Libs of TikTok posted the Whale Statement on x.com imploring FWC terminate Plaintiff. ECF 8-3. At 1:22 p.m. Warthen spoke to Tucker for about five minutes, confirmed that Brown worked in her division and her OPS status, and asked Tucker to start the termination process. ECF 42-2 at 4; ECF 42-6 at 88:8–:18, 89:14–:20, 91:5–:7. They did not discuss Brown's specific role, job performance or alternatives to termination, and Warthen did not ask if Tucker had received any complaints. ECF 42-6 at 91:10–:17, 91:22–:24. Tucker expressed reservations, including that Brown's termination could violate the constitution or appear politically motivated, but Warthen confirmed that the decision had been made. ECF 42-2 at 4–6; ECF 42-6 at 96:10–:18, 96:24–97:1, 97:9–99:2.

*B. FWC Actions After the Decision*

At 5:12 p.m. Sunday, Young received a text message from the head of FWC's law enforcement division, saying "Wanted to give you a heads-up. Looks like we have a biologist with negative posts about Charlie Kirk's death" and attaching the Whale Statement. ECF 42-5 at 15:25–16:16, 18:1–:16; ECF 42-16. Young

responded back, informing Smith that "termination papers already written." ECF 42-5 at 19:15–20:6; ECF 42-16. At 6:34 p.m. Sunday night, FWC posted on x.com, announcing a "swift and immediate resolution regarding [Plaintiff's] employment." ECF 8-4; ECF 42-3 ¶¶ 28–29; ECF 42-4 ¶¶ 32–33.

On Monday morning, at Warthen's direction, Tucker made terminating Brown her top priority. ECF 42-6 at 94:19–95:1. Tucker finalized the termination letter and coordinated with regional staff to deliver the termination letter in person. ECF 42-6 at 95:4–:13, 102:20–103:8. Warthen called Tucker and regional staff to check on the status of Brown's termination. ECF 42-6 at 101:5–102:22; ECF 42-8 at 19:6–:21.

The termination letter was delivered at 10:35 a.m. ECF 8-2 ¶ 37. At 10:45 a.m. Libs of TikTok posted on x.com, "BREAKING: I can confirm from a source that [Plaintiff] has been FIRED from [FWC]." ECF 8-6. At 11:55 a.m. FWC announced the termination on X.com. ECF 8-5; ECF 42-3 ¶¶ 32–33; ECF 42-4 ¶¶ 36–37. At 11:56 a.m. Tucker emailed the human resources liaison to complete the termination paperwork. ECF 42-6 at 108:11–:20.

## IV. DEFENDANTS' MOTIVATIONS AND AVAILABLE INFORMATION

### *A. FWC's Zero-Tolerance Policy*

Publicly, FWC cited a "zero-tolerance policy towards the promotion of violence and hate". ECF 8-5. FWC considers its policy against "conduct

unbecoming" of an FWC employee a zero-tolerance policy. ECF 42-9 at 94:20–:22. When asked whether a single social media post perceived as violent and hateful could lead to termination, Young replied that "If they're OPS, I can assure you, yes." ECF 42-5 at 66:15–67:8. FWC interpreted the Whale Statement as promoting violence and hate by "making light of an assassination". ECF 42-5 at 66:15–:18; ECF 42-9 at 100:1–:18. In Young's view, because Plaintiff spoke about Charlie Kirk's public killing and did not discuss "how horrible it is", she was, "in a sense", "advocating for it". ECF 42-5 at 58:8–:17.

FWC terminated two more employees for social media posts that were critical of Kirk after Plaintiff's September 15th termination: another biologist in Tucker's division, and a non-sworn employee in the law enforcement division. ECF 42-2 at 6, 9; ECF 42-5 at 94:4–:18, 97:16–98:7; ECF 42-6 at 116:9–:15, 118:13–:17, 119:21–120:12; ECF 42-9 at 25:19–:23, 26:20–28:1, 131:15–133:25. Tucker was directly involved in the other biologist's termination and expressed skepticism for the need to terminate given the lack of attention and the lack of public disclosure of any FWC affiliation. ECF 42-2 at 8–9; ECF 42-6 at 121:1–:15. FWC executives instructed Tucker to terminate anyway, and Tucker complied once again. ECF 42-2 at 9; ECF 42-6 at 121:20–122:6. Neither fired employee attracted attention beyond an anonymous complaint notifying FWC of their comments. ECF 42-5 at 94:19–95:9, 98:19–99:4; ECF 42-6 at 121:13–:15, 122:12–:19; ECF 42-9 at 28:11–:16;

133:10–:25.

*B. <u>Information Available to FWC at the Time of Termination</u>*

The Whale Statement did not directly threaten FWC employees or facilities, nor did anyone protest or demonstrate outside any FWC office in response. ECF 42-3 ¶¶ 39–40; ECF 42-4 ¶¶ 43–44. Defendants admit they did not terminate Plaintiff based on a credible threat of violence, refusal to work with Brown by any FWC employee or partner, or concern that Brown could no longer effectively monitor shorebirds or seabirds. ECF 42-3 ¶¶ 42–44, 46–49; ECF 42-4 ¶¶ 46–48, 50–53.

Defendants submitted a Declaration from Tucker in opposition to Plaintiff's preliminary injunction motion, which Tucker swore "under penalty of perjury" was "true and correct based on my personal knowledge and review of official [FWC] records". ECF 21-1. Tucker asserted in the Declaration that "the agency's communications office began receiving a large volume of calls, emails, and online messages from citizens, volunteers, and partner organizations" and that "hundreds of citizen contacts and multiple media inquiries were received across FWC's public channels." ECF 21-1 ¶¶ 4–5. None of that it true. In her deposition, Tucker acknowledged that she relied entirely on hearsay for her Declaration and that she had no personal knowledge at all:

> Q And you don't have any personal knowledge about any of those complaints or the social media complaints or the tone of them or whether they were belligerent or not, other than what Mr. Warthen communicated to you?

A Yes.

ECF 42-6 at 141:11–:16. She further acknowledged her "review of official [FWC] records" referred to her conversations with Warthen on Sunday and Monday, and she was unsure where the "hundreds" characterization came from. ECF 42-6 at 125:19–127:8, 128:5–132:8; 140:15–:19.

Warthen did not recall discussing the volume of complaints with Tucker and did not think he would have been able to quantify the volume then or now. ECF 42-8 at 34:15–35:11. Defendants did not identify any volunteers or partner organizations that complained. ECF 42-5 at 55:14–:19; ECF 42-6 at 58:24–59:8, 61:12–:16, 128:20–129:9; ECF 42-9 at 89:3–:7.

The Defendants produced only four complaints that were sent directly to Warthen, Tucker, and Young on Sunday:

1. ZC Corbett emailed the Whale Statement to Young at 3:04 p.m. Sunday, expressing disappointment. There is no response in the record. ECF 42-24; ECF 42-9 at 105:16–106:10.
2. Chuck Echenique texted a screenshot of the Whale Statement to Warthen at 6:42 p.m. Sunday. Warthen responded at 10:07 p.m. Sunday that it was being addressed. ECF 42-8 at 27:13–28:2, 29:19–30:11; ECF 42-17.
3. Kenne Helm emailed Tucker at 9:32 p.m. Sunday critical of the Whale

Statement, and she responded at 8:00 a.m. Monday that it had been referred to OIG. ECF 42-2 at 11; ECF 42-6 at 138:9–139:4; ECF 42-20.

4. Brandy Elliott emailed Young twice: 10:49 p.m. Sunday and 5:40 p.m. Monday. Young did not recall responding. ECF 42-5 at 78:25–79:25; ECF 42-21.

At 1:15 p.m. on Monday, September 15, FWC Office of Inspector General emailed a final independent report documenting the complaints the office received about the Whale Statement; the OIG report included 38 complaints received Sunday and 12 received Monday. ECF 42-15. Neither Young, Tucker, nor Warthen recall reading or discussing the report. ECF 42-5 at 69:12–70:9; ECF 42-6 at 110:8–111:7; ECF 42-8 at 32:4–:18.

Tucker averred in her Declaration that the received citizen contacts and media inquiries required the diversion of staff resources to manage responses. ECF 21-1 ¶ 5. Tucker explained that this meant pulling Young and Warthen away from what they needed to be doing. ECF 42-6 at 132:20–133:5. The communications office released a statement on Sunday evening, which was not unusual. ECF 42-9 at 97:11–:13. FWC press office received and one complaint and four media inquiries regarding Brown, three of which were in response to their announcement of Brown's termination; the agency responded by confirming Brown's identity and sending the

same press statement from x.com. ECF 42-9 at 106:15–107:5, 127:18–129:10; ECF 42-22; ECF 42-23. FWC did no interviews and held no press conferences. ECF 42-9 at 129:16–130:3. Aside from those noted above, FWC did not respond individually to complainants. ECF 42-5 at 44:5–:10, 81:17–83:1, ECF 42-6 at 137:23–138:13. No FWC employees worked overtime or unscheduled shifts due to the Whale Statement. ECF 42-1 ¶ 6; ECF 42-5 at 55:8–:13; ECF 42-9 at 87:10–88:2.

FWC is accustomed to controversy; as Young explained, "There's all kinds of issues that our agency deals with that people are unhappy with at times." ECF 42-5 at 31:4–7. In one such controversy, a video of FWC officers mistakenly euthanizing a snake circulated on social media, resulting in protests at FWC Commission meetings, as well as emails, phone calls, and "a hundred or more . . . Facebook posts". ECF 42-9 at 148:19–149:7. In another, 4,000 people complained, sometimes threateningly, when the FWC Commission authorized bear hunts during 2025. Many, including FWC partners, raised concerns about the agency's credibility and public trust. ECF 42-5 at 31:15–19; ECF 42-6 at 42:19–43:8, 135:13–:22; ECF 42-8 at 12:3–14:4.

## V. Impact of Defendants' Actions

Defendants' actions continue to chill her speech. ECF 8-2 ¶¶ 29, 47. Brown has posted to her Instagram account only twice in the last five months out of fear of backlash linked to FWC's posts about her. ECF 8-2 ¶ 47; ECF 42-13 ¶ 24.

Plaintiff's career as a wildlife biologist has been impaired by her termination. ECF 8-2 ¶¶ 41, 45, 46, 48–50. She has applied for and been rejected from or ignored by various jobs, including a retail sales job at PetSmart. ECF 42-13 ¶ 21. Plaintiff has accrued personal expenses for mental health treatment. ECF 42-13 ¶ 14.

Since her termination, she has accrued $19,120 in lost compensation, from September 15, 2025 through January 31, 2026. ECF 8-2 ¶¶ 43−44; ECF 42-13 ¶ 16. She is accruing further lost compensation during the shorebird breeding season and will miss her regular yearly overtime period during Memorial Day weekend. ECF 42-13 ¶ 18.

## MEMORANDUM OF LAW

### I. LEGAL STANDARDS

"Summary judgment is appropriate where the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005) (internal quotations omitted). In disputing a material fact, it is insufficient for the nonmoving party "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, "[f]or factual issues to be considered genuine, they must have a real basis in the record." *Ellis*, 432 F.3d at 1326 (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).

An employee's "exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 574 (1968). Where an employee's speech is protected, the government must have "an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

To prevail on a First Amendment retaliatory termination claim, an employee must show that they spoke as a citizen on a matter of public concern and that that speech was a motivating factor in their termination. *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989) (citing *Rankin v. McPherson*, 483 U.S. 378, 384–85 (1987); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). If that is the case, the employee's free speech rights are balanced against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Mt. Healthy*, 429 U.S. at 284 (quoting *Pickering*, 391 U.S. at 568). "The State bears a burden of justifying the discharge on legitimate grounds." *Rankin*, 483 U.S. at 388 (citing *Connick v. Myers*, 461 U.S. 138, 150 (1983)). "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Id*. at 384.

Decisions based on the content of speech are presumptively unconstitutional. *See generally Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional . . ."). That goes double for government actions actively favoring one side of the debate or, as in this case, punishing those who adopt a contrary viewpoint:

> When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. *See R.A.V. v. St. Paul*, 505 U.S. 377, 391, 112 S.Ct. 2538, 2547, 120 L.Ed.2d 305 (1992). Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. *See Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995).

## II. Brown is Entitled to Summary Judgment on Her Retaliation Claim Against Young (Count I).

Young retaliated against Brown in violation of her First Amendment rights. The only dispute for the Court to resolve is *Pickering* balancing, and the evidentiary record supports only one conclusion: Brown's First Amendment interests far outweigh FWC's now-revealed-to-be-trivial burden in responding to a few dozen inquiries and complaints. Plaintiff conclusively established every other element of Count I even before discovery.

*A. Brown's First Amendment interests outweigh the government interests.*

The agency's interest in effective and efficient fulfillment of its responsibilities was not impacted by Brown's statement. There is no evidence that the Whale Statement "impair[ed] discipline by superiors or harmony among co-workers, ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[d] the performance of the speaker's duties or interfere[d] with the regular operation of the enterprise." *See Labriola v. Miami-Dade Cnty.*, 142 F.4th 1305, 1309–10 (11th Cir. 2025) (quoting *Rankin*, 483 U.S. at 388).[2] None of Brown's colleagues or partners complained about the Whale Statement. ECF 42-5 at 55:14–:19; ECF 42-6 at 58:24–59:8, 61:12–:16, 128:20–129:9; ECF 42-9 at 89:3–:7. Brown's former colleagues

---

[2] The level of disruption in *Labriola* was simply on a different plane:

> The piece "brought a lot more work" to the office, in part because, following its publication, the office received "a lot of phone calls." . . . According to Labriola's supervisor, no other event had ever "caused such a large number of phone calls." . . . Confirming this description, the Chairman's chief of staff testified that the calls "became such a problem that it really prevented us from doing our day-to-day operations during those days." . . . He continued: "[W]e had to refocus a lot of our attention from some of the legislative strategies that we had to dealing with the damage control. . . . [W]e were put in a situation where we had to reprioritize this issue with Mr. Labriola and completely step off from other initiatives that we had . . . ."

*Id*. at 1310. Nothing remotely like that happened in response to Whale Statement.

nominated her for the Purveyor of Awesomeness Award and continue to support her. ECF 8-2 ¶ 39; ECF 42-13 ¶ 10. There was no interference with the agency's regular operation. ECF 42-1 at 4; ECF 42-2 at 3–4; ECF 42-9 at 87:10–:15; *see also* ECF 42-3 ¶¶ 39–44, 46–49; ECF 42-4 ¶¶ 43–48, 50–53. That is unsurprising, as the Whale Statement was not related to her job duties as a shorebird biologist whatsoever, ECF 42-1 at 5; ECF 42-2 at 6; ECF 42-6 at 89:6–:11, or to the agency's work, ECF 42-5 at 23:10–:14, 59:9–:14; ECF 42-6 at 89:6–:13; ECF 42-9 at 9:17–10:3.

Defendants publicly claimed that Brown was terminated for violating a "zero-tolerance policy" against promoting hate and violence. ECF 8-5; ECF 42-5 at 57:8–:20, 58:8–:17, 66:15–67:8; ECF 42-9 at 94:20–:22, 100:1–:18. Reputational concerns took center stage. ECF 29 at 8–9; ECF 42-3 ¶ 45; ECF 42-4 ¶ 49. However, "[t]he reaction of a community cannot always dictate constitutional protections to employees." *McMullen v. Carson*, 754 F.2d 936, 940 (11th Cir. 1985). To be relevant to *Pickering* balancing and not an unconstitutional "heckler's veto", public hostility must be relevant to the job at issue. *Oakes Farms Food & Distrib. Servs., LLC v. Adkins*, 154 F.4th 1338, 1348 (11th Cir. 2025). This is most often the case when the job at issue involves law enforcement, which "requires mutual respect, trust, and support" and for which the First Amendment provides fewer protections. *McMullen*, 754 F.2d at 938-40 (finding *Pickering* favored Sheriff "faced with an

explosive racial situation in a city already marked by poor relations”).

While a government employer “‘need not wait for disruption or disturbance to occur before acting’”, “[r]easonable possibility of adverse harm” is required. *Moss*, 782 F.3d at 622 (quoting *Anderson v. Burke Cnty., Ga.,* 239 F.3d 1216, 1221 (11th Cir. 2001). “Government ‘justification[s]’ for interfering with First Amendment rights ‘must be genuine, not hypothesized or invented post hoc in response to litigation.’” *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)); *see also Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1274 (11th Cir. 2004) (“Where students’ expressive activity does not materially interfere with a school’s vital educational mission, and does not raise a realistic chance of doing so, it may not be prohibited simply because it conceivably might have such an effect.”).

Yet, here, Young relied solely on alleged commentary appearing in social media posts that were not sent to Young or to FWC but merely part of the blogosphere. ECF 42-1 at 3; ECF 42-5 at 7:9–9:10; ECF 42-9 at 32:11–33:10; ECF 42-8 at 14:13–15:10, 16:11–16:20. Young could point to no specific posts and preserved no examples. ECF 42-5 at 24:9–:19, 25:7–27:12. After encountering these social media posts around 9:00 p.m. on Saturday, Young took no more than 17 hours to direct Brown’s termination. ECF 42-1 at 3; ECF 42-5 at 7:9–9:10; ECF 42-2 at 4–6; ECF 42-6 at 88:8–:18, 89:14–:20, 91:5–:7, 96:10–:18, 96:24–97:1, 97:9–99:2;

*contrast Snipes v. Volusia Cnty.*, 704 F. App'x 848, 853 (11th Cir. 2017) (per curiam) (finding *Pickering* tilted toward employer where, among other factors, organizations testified they would have held a protest rally and that recruitment efforts in the Black community would have been harmed had law enforcement officer not been swiftly terminated).

Upon learning of Brown's statement, Young was only concerned with confirming whether Brown was an employee and whether she was OPS. There was no inquiry into how her role as a biologist could be impacted or whether anyone who worked with her had complained. ECF 42-5 at 6:25–7:2, 9:11–11:2, 11:9–12:2, 21:10–22:15; ECF 42-6 at 91:5–:17; ECF 42-8 at 31:5-:7. Instead, Defendants applied a zero-tolerance, one-strike policy because Young interpreted her speech as advocating violence by not talking about how horrible it was that Kirk had been killed. ECF 42-5 at 58:8–:17, 66:15–67:8.

It is clear from the argument at the preliminary injunction hearing and in their deposition testimony that Defendants believed Brown could be freely discharged for her speech because she was an OPS employee. While paying lip service to the idea that OPS workers had equal rights, it is apparent on this record that Brown's OPS status made all the difference in the actual termination decision. Of course, the law runs completely contrary to the Defendants' position. *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1562 (11th Cir. 1995) (citing *Rankin v. McPherson,*

483 U.S. 378, 383–84 (1987)). ("A state employee does not need a protectable property interest, or any other state-created right, in order to maintain a First Amendment retaliatory discharge claim."). And Young never consulted legal counsel before firing Brown. ECF 42-5 at 21:21–:24.

In discussing the decision to terminate Brown with Warthen, Young did not discuss the volume of complaints coming into the agency. ECF 42-8 at 34:23-35:11. Warthen is clear that he would not have been "able to quantify that." ECF 42-8 at 34:23–35:11. Although Tucker quantified the volume as "hundreds" in her declaration, that language was drafted by attorneys; she only knew that Warthen said he, Young, and Boyd were getting calls from unknown people. ECF 42-6 at 130:15–132:8.

Although Tucker asserted in a sworn declaration in October that within hours of the agency's association with Brown being posted, the agency's communications office began receiving large volume of calls, ECF 21-1 at ¶ 4; she clarified in deposition that she based this on brief conversations with Warthen. ECF 42-6 at 128:5–:19. Young and Warthen said they received no calls. ECF 42-5 at 13:4–:8; ECF 42-8 at 16:24–17:6, 17:14–:19, 25:11–:14. After Brown's termination, Defendants learned of approximately 50 complaints received by FWC's Office of Inspector General—complaints they neither reviewed nor responded to. ECF 42-5 at 69:12–70:9; ECF 42-6 at 110:8–111:7; ECF 42-8 at 32:4–:18.

Brown's statement was not related to her work as a shorebird biologist or FWC's mission. ECF 42-6 at 89:4–:13. All that mattered is that the agency learned that Brown made a statement that they interpreted as hateful. Young subsequently fired two more employees the agency learned had made statements critical of Kirk. ECF 42-2 at 6, 9; ECF 42-5 at 94:4–:18, 97:16–98:7; ECF 42-6 at 116:9–:15, 118:13–:17, 119:21–120:12; ECF 42-9 at 25:19–:23, 26:20–28:1, 131:15–133:25. They were fired even though these statements were not circulated by others online and the agency received no more than one complaint for each. ECF 42-2 at 8–9; ECF 42-6 at 121:1–122:6.

*B. Brown's speech was protected.*

Brown spoke as a citizen, not as an employee. The Whale Statement did not "owe[] its existence" to Brown's employment as a shorebird biologist. *See Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 424). Defendants have asserted that Brown's speech was "made pursuant to her official duties" and refused to admit otherwise. ECF 35 at 29; ECF 42-3 ¶¶ 9–12; ECF 42-4 ¶¶ 13–16. But their witnesses confirmed in depositions that the Whale Statement had nothing to do with her job duties whatsoever. ECF 42-1 at 5; ECF 42-5 at 23:10–:14; ECF 42-2 at 6; ECF 42-6 at 89:6–:11.

Brown spoke on a matter of public concern when she shared her reaction to the death of a political figure whose controversial public statements sparked

adoration from some and contempt from others. Speech critical of "public figures who are intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large" is a natural part of the "robust political debate encouraged by the First Amendment." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 51 (1988) (internal quotation marks omitted); *see also Rankin*, 483 U.S. at 387 (finding a statement that "if they go for him again, I hope they get him" in response to news of an attempted presidential assassination was a statement on a matter of public concern).

*C. Young retaliated against Brown because of her speech.*

Defendants cannot dispute that they terminated Brown because she reposted the Whale Statement. ECF 26 at 7 ("[T]hat dog won't hunt."). While the Defendants assert that Brown was terminated "for lawful, non-retaliatory reasons independent of any alleged protected speech," ECF 35 at 29, Defendants admitted that Brown would not have been fired had they not learned of her statement. ECF 42-5 at 35:23–36:9; ECF 42-6 at 137:7–:13; ECF 42-9 at 55:21–56:2. Brown has also pled and proven that Defendants engaged in viewpoint discrimination when they terminated her. Young was forthright in acknowledging that he viewed Brown's social media post as advocating for a particular political position regarding Charlie Kirk's death,

which he viewed as contrary to FWC's principles. ECF 42-5 at 57:1–59:14, 66:12–67:8.[3]

## III. BROWN IS ENTITLED TO SUMMARY JUDGMENT ON HER VIEWPOINT AND CONTENT DISCRIMINATION CLAIMS AGAINST DEFENDANTS (COUNTS II & III).

Young terminated Brown because of the content of her speech and Tucker executed that unconstitutional decision. This case involves "[o]ne of the most egregious types of First Amendment violations"—viewpoint discrimination. *Holloman ex rel. Holloman*, 370 F.3d at 1279. "Government actors may not discriminate against speakers based on viewpoint, even in places or under circumstances where people do not have a constitutional right to speak in the first place." *Id.* at 1280 (even if student "did not have the right to express himself in the manner he did, his rights were still violated if he was punished because [his teacher]

---

[3] Two excerpts from Young's deposition tell the story:

> [I]t's not something that I would've ever said on social media, because I don't think it aligns with the values of our agency.

ECF 42-5 at 38:1–:3.

> A. Well, if you're not—if you're not against it, then in my mind, you're advocating for it. I mean, if you're not going to—if you're going to discuss it and you're not discussing how horrible it is for someone else to—for another human being to be killed on television or on social media in front of others, then in a sense, you must be advocating for it.

ECF 42-5 at 58:11–:17.

disagreed or was offended by what he said").

FWC fired Brown based on the content of her statement. ECF 42-1 at 4–5. The Defendants fired Brown because they found her statement contained "hateful sentiment" in violation of the agency's zero-tolerance policy. ECF 8-6; ECF 42-3 at ¶¶ 37, 66; ECF 42-4 at ¶¶ 41, 69; ECF 42-5 at 67:3–:8. The Defendants interpreted her statement as "advocating violence". ECF 42-1 at 5. Defendant Young saw the statement as "making light" of the "assassination or killing of another human being" and "school shootings of the kids". ECF 42-5 at 57:8–:20. In Young's view, because Brown spoke about Kirk's public killing and did not discuss "how horrible it is", she was, "in a sense", "advocating for it." ECF 42-5 at 58:8-:17. Defendants terminated two other employees whose statements critical of Kirk did not comport with Young's favored viewpoint. ECF 42-2 at 6, 9; ECF 42-5 at 94:4–:18, 97:16–98:7; ECF 42-6 at 116:9–:15, 118:13–:17, 119:21–120:12; ECF 42-9 at 25:19–:23, 26:20–28:1, 131:15–133:25. FWC did not terminate anyone who had praised or supported Kirk. ECF 42-3 at ¶ 20.

Tucker executed Brown's termination for her personal speech on a matter of public concern that the agency found to be intolerable "hateful sentiment". In doing so, Tucker violated Brown's clearly established constitutional right to speak on matters of public concern.

"Qualified immunity shields public officials from liability for civil damages

when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Jarrard v. Sheriff of Polk Cnty*., 115 F.4th 1306, 1323 (11th Cir. 2024) (quotation omitted). It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)). The "salient question" is "whether the state of the law" gave the defendant "fair warning" that the action was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). There are three ways to establish that a defendant had "fair warning": (1) "a materially similar case has already been decided", (2) "a broader, clearly established principle that should control the novel facts of the situation", or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (citation omitted).

This is not a case of an official making a reasonable but mistaken judgment about open legal questions. "[I]t is clearly established that the State cannot fire an employee—even an at-will employee—solely in retaliation for the employee's speech as a citizen on a matter of public concern." ECF 33 at 6 (citing *Rankin v. McPherson,* 483 U.S. 378, 383–84 (1987)); *see also Bryson*, 888 F.2d at 1565 ("[T]he law is well-established that the state may not demote or discharge a public employee in retaliation for" exercising his or her First Amendment rights.)

It is undeniable that Brown spoke as a citizen on a matter of public concern. Nobody can dispute she was fired based on the content of her statement. ECF 42-1 at 4–5. She, like others who made statements critical of Kirk, *supra* at 11–12, was fired for expressing views contrary to the agency's preferred viewpoint. Tucker had fair notice that such action would violate Brown's rights. Further, Tucker was aware of media coverage of the constitutionality of firing public employees for their statements about Kirk's death and warned her supervisor that firing Brown could be seen as unconstitutional. ECF 42-2 at 5–6; ECF 42-6 at 98:20-99:17. Instead of following the law, Tucker chose to follow orders. She is not entitled to qualified immunity.

## IV. Remedies

### *A. Brown is entitled to reinstatement.*

Brown is entitled to reinstatement into her position as a Fisheries & Wildlife Biologist Scientist III, Critical Wildlife Area Biologist in the Northwest Region. Reinstatement is the preferred remedy in wrongful discharge cases. *Allen v. Autauga Cnty. Bd. of Educ.*, 685 F.2d 1302, 1305–06 (11th Cir. 1982). In exceptional cases, "extenuating circumstances warrant" front pay in lieu of reinstatement. *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 619 (11th Cir. 2000) (quoting *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1339 (11th Cir. 1999)). In such cases, trial courts must "carefully articulate" their reasons for awarding front pay. *Id.*

This is not a case that necessitates front pay in lieu of reinstatement, but if front pay was ordered, it alone would not make Brown whole. To be made whole, Brown would also need injunctive relief preventing FWC from further retaliatory interference with her pursuit of employment. Only a few organizations in Florida work on shorebird protection; most, if not all, work in partnership with FWC. ECF 42-13 ¶¶ 3, 20. Brown believes FWC is preventing her references from vouching for her, and having her separation reflected in her personnel file as a termination rather than resignation is hindering her job search. ECF 42-13 ¶ 21.

*B. Brown is entitled to compensatory damages from Tucker.*

Under 42 U.S.C. § 1983, a party injured because of a deprivation of her civil rights can recover damages naturally flowing from that violation. *Carey v. Piphus*, 435 U.S. 247, 254-57 (1978). Such damages include both economic harms and noneconomic injuries, such as "impairment of reputation . . . , personal humiliation, and mental anguish and suffering." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305–07 (1986) (citation omitted). "'Humiliation and insult are recognized, recoverable harms,' and a plaintiff's own testimony of embarrassment and humiliation can be sufficient to support an award for compensatory damages." *Bogle v. McClure*, 332 F.3d 1347, 1359 (11th Cir. 2003) (quoting *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir.1999)). Even "in the absence of . . . actual injury," a prevailing section 1983 plaintiff is "entitled to nominal damages." *Slicker v.*

*Jackson*, 215 F.3d 1225, 1229–30 (11th Cir. 2000) (citing *Carey*, 435 U.S. at 266–67; *Stachura*, 477 U.S. at 308 n. 11).

Plaintiff is entitled to recover compensatory damages resulting from Tucker's violation of her First Amendment rights. As to economic damages, as of January 31, Plaintiff has accrued lost wages of $**19,120** and mental health treatment costs of $275. Plaintiff will continue to accrue lost wages until her reinstatement. She made $23.90 per hour at the time of her termination and worked 40 hours a week. ECF 42-13 ¶ 16. Since January 31, 2026, Plaintiff continues to accrue lost wages. She expects to lose an additional **$716.80** that she would have earned during her usually overtime work during Memorial Day weekend. *Id.* ¶ 18.

In addition to lost wages and treatment costs, Brown has experienced humiliation and mental anguish and suffering. *Id.* ¶¶ 12–13, 24, 27. She spent the better part of a decade establishing herself in a field with few vacancies. *Id.* ¶ 3. Defendants publicly humiliated her, misrepresenting her political speech as "promot[ing] . . . violence and hate". ECF 8-5. Brown attests that she has suffered "significant guilt, pain, and frustration" over her belief that her public firing for political speech has led to significant distress and unease among her former coworkers and colleagues for their own employment. ECF 42-13 ¶ 14. Defendants' ongoing actions have interfered with her ability to replace the income she has lost. *Id.* ¶¶ 20, 21. Her fear of further retaliation and public embarrassment and hopes of

being able to work with FWC in the future have led her to continue to self-censor. *Id.* ¶ 24.

*C. <u>Brown is entitled to punitive damages from Tucker.</u>*

Punitive damages are proper in section 1983 cases when the defendant acted in their individual capacity with "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law." *Smith v. Wade*, 461 U.S. 30, 41–51 (1983); *see also Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1047 (11th Cir. 2008).[4] Defendant Tucker herself raised the existence of constitutional concerns if Brown was terminated for her speech. ECF 42-2 at 4–6; ECF 42-6 at 98:20–99:9. Tucker also expressed concerns that the termination could be seen as politically motivated and could generate public controversy. ECF 42-2 at 4–6; ECF 42-6 at 96:10–:18, 97:9–98:19. She had not received any complaints from individuals involved in Brown's work; she spoke with a subordinate overseeing Brown's work who expressed surprise at the termination decision. ECF 42-2 at 3; ECF 42-6 at 92:18–93:12. Despite awareness that Brown's free speech rights were

---

[4] Plaintiff can recover punitive damages even if she is awarded only nominal damages for the First Amendment violation. *See, e.g.*, *Hershell Gill Consulting Engineers, Inc. v. Miami-Dade Cnty.*, 333 F.Supp. 2d 1305, 1343 n. 14 (S.D. Fla. 2004) ("In cases where only nominal damages are awarded to civil rights plaintiffs, punitive damages awarded in the federal courts generally top out at around $15,000.").

implicated and in the absence of any workplace disruption, Tucker signed and executed the termination letter. The evidence is sufficient to support finding that Tucker acted with reckless or callous indifference to Brown's clearly established First Amendment rights.

WHEREFORE, the Plaintiff moves for entry of Summary Judgment and that, incident thereto, she be granted declaratory and equitable relief, including reinstatement, and an award of compensatory and punitive damages.

*Respectfully submitted,*

/s/ *Caroline A. McNamara*
AMERICAN CIVIL LIBERTIES FOUNDATION OF FLORIDA, INC.
CAROLINE A. MCNAMARA
Florida Bar No. 1038312
DANIEL B. TILLEY
Florida Bar No. 102882
MICHELLE MORTON
Florida Bar No. 81975
SAMANTHA J. PAST
Florida Bar No. 1054519
4343 W Flagler Street, Ste 400
Miami, Florida 33134-1585
(786) 363-2738
cmcnamara@aclufl.org
dtilley@aclufl.org
mmorton@aclufl.org
spast@aclufl.org

/s/ *Gary S. Edinger*
BENJAMIN, AARONSON, EDINGER & PATANZO, P.A.
GARY S. EDINGER, Esquire
Florida Bar No. 0606812
305 N.E. 1st Street
Gainesville, Florida 32601
(352) 338-4440
(Fax) (352) 337-0696
GSEdinger12@gmail.com

*Attorneys for Plaintiff*

**CERTIFICATE OF COMPLIANCE**

This Motion complies with the type-volume limitation of Rule 7.1(F) & (I), N.D. Fla. Loc. R. This Motion contains 7746 words, excluding the parts of the Response exempted by Rule 7.1(F).

/s/ *Caroline A. McNamara*
Caroline A. McNamara