UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**BRITTNEY BROWN**,

      Plaintiff,

vs.

**ROGER A. YOUNG** in his official capacity
as Executive Director of the Florida Fish
and Wildlife Conservation Commission,
and **MELISSA TUCKER**,
in her individual capacity,

      Defendants.

)
)
)   CASE NO.: 4:25-cv-419
)
)
)
)
)
)
)
)
)
)
)
/

## PLAINTIFF'S MOTION FOR SANCTIONS
## FOR FILING FRAUDULENT DECLARATION

COMES NOW the Plaintiff, by and through her undersigned attorneys, and moves this Court to impose sanctions against the Defendants and their counsel, pursuant to 28 U.S.C. §1927 and the Court's inherent authority, for the filing of a false and fraudulent Declaration, ECF 21-1, which caused material injury to the Plaintiff and to the administration of justice, and says:

**INTRODUCTION**

This Motion is not filed lightly. Plaintiff and her counsel are fully cognizant of the unusual nature of this Motion as well as the impact that the imposition of sanctions could have on this government agency and its counsel. However, Plaintiff feels fully justified in presenting these circumstances to the Court and seeking the most severe of sanctions for the most severe of transgressions: a deliberate deception through a sworn statement relied upon by the Court to deny injunctive relief, with the consequent suppression of Plaintiff's fundamental free speech rights.

**FACTS**

1.      Plaintiff was fired for posting a political meme concerning the death of activist, Charlie Kirk. ECF 42-9 (30(b)(6) Dep.) at 56:3-:5 ("Q: Was there any reason for her termination, other than the post of the whale statement? A: Not to my knowledge."); ECF 42-5 (Young Dep.) at 35:23-36:9; ECF 42-6 (Tucker Dep.) at 137:7-:13.

2.      Plaintiff brought this civil rights action claiming that her termination was in retaliation for her speech and an instance of blatant viewpoint-based discrimination. ECF 1.

3.      Plaintiff named Melissa Tucker as an individual Defendant because Tucker signed the termination notice and did so under circumstances where any objective administrator would have known that such termination was

unconstitutional under clearly established law. ECF 33 at 5-6; ECF 42-6 at 137:7-:13.

4.    Plaintiff filed her Motion for Preliminary Injunction on October 3, 2025, ECF 8, seeking her immediate reinstatement to her former position and the vindication of her speech rights, pending a determination on the merits.

5.    Defendants filed a Response in opposition to the Motion, ECF 21, which was accompanied by a Declaration, ECF 21-1, signed under oath by Defendant Tucker. That Declaration is the subject of this Motion.

6.    Although the allegations of the Tucker Declaration will be addressed in microscopic detail below, the salient facts can be easily summarized: Tucker claimed personal knowledge that Plaintiff's social media post actually disrupted the operations of the Florida Fish and Wildlife Conservation Commission ("FWC") through "hundreds" of complaints received from hostile citizens. ECF 21-1 ¶¶ 4-5.

7.    At the hearing on the Motion for Preliminary Injunction, Defendants relied extensively on the Tucker Declaration and referred repeatedly to the actual disruption sworn to by the Defendant. ECF 30 at 8:17-:21, 26:5-:9, 54:3-55:16. Indeed, Defendants' counsel refers to the Declaration only six lines into his presentation:

> Tucker declaration, paragraph 4, confirms she served in an at-will OPS position, while paragraphs 9 through 13 of the same declaration

document what followed: Hundreds of complaints, partner emails, and media requests that demanded immediate management attention.

ECF 30 at 8:17-:21.

8.    It is no exaggeration to say that Plaintiff did not secure a preliminary injunction because of the Tucker Declaration. Indeed, the Court expressly referenced that Declaration at the injunction hearing:

> THE COURT: Let's pause there, though. It seems to me that if the declaration of Ms. Tucker had simply said, We received complaints, and based on the complaints, we concluded it would be disruptive, Judge, there's actual facts beyond that conclusion, which is there's hundreds of citizen contacts, multiple media inquiries, and the volume and the tone were negative, so, Judge, she may not have written a tome on it, but she did provide facts underlying the conclusion; correct?
>
> MR. GREENE: That's correct, yes.
>
> THE COURT: And your view is, Judge, based on those facts, whether you believe they are a scam or not, that's enough for us and it would be the plaintiff's burden to overcome those facts; correct?
>
> MR. GREENE: That's correct, Your Honor.
>
> THE COURT: I understand.

ECF 30 at 55:2-:16.

9.    In its Order denying the preliminary injunction, this Court concluded that Plaintiff's social media post was private speech on a matter of public interest subject to the "*Pickering* framework". ECF 26 at 5-7. The Court discussed and

rejected all of Defendants' legal arguments save one: Plaintiff could not overcome

the evidence of disruption set forth in the Tucker Declaration:

> In essence, Plaintiff asks this Court to discount Melissa Tucker's unrebutted declaration submitted on Defendant Young's behalf. In it, Defendant Tucker provides evidence that there was a swift and largely negative reaction from the public concerning Plaintiff's Instagram story which "disrupted agency operations, required diversion of staff resources to manage responses, and raised legitimate concerns about the agency's credibility and public trust." ECF No. 21-1 ¶ 5. While Plaintiff understandably argues that this declaration is short on specifics and largely conclusory, Plaintiff also chose not to seek expedited discovery to depose Defendant Tucker or cross-examine her at the hearing to explore flaws in Defendants' position. Without more, this Court cannot conclude on this sparse record that the public's negative reaction was not disruptive enough to justify the action FWC took.

ECF 26 at 11. The Court could not have reached that conclusion in the absence of

the Tucker Declaration.

10.    Discovery, which concluded at the end of January, showed that the

Tucker Declaration was replete with fraudulent misrepresentations on every page.[1]

Plaintiff will here identify each of the substantive averments in the Tucker

---

[1] This Motion is timely filed. Discovery only concluded on January 30th with the deposition of George Warthen. That deposition was initially scheduled for an earlier date but was postponed at Defendants' request. Warthen's testimony was indispensable because Tucker identified him as the sole source for all of the information included in her Declaration. Plaintiff immediately ordered that transcript so that it would be available to support this Motion.

Declaration and provide the record citations that show that each statement is utterly false:

> A.    <u>Personal Knowledge</u>:
>
> I have personal knowledge of the circumstances surrounding the termination of Brittney Brown's employment and of the events leading up to and following that decision. My statements are based on firsthand involvement, direct observation, and contemporaneous agency records maintained in the ordinary course of business.

ECF 21-1 (Tucker Dec.) at 1-2, ¶ 2

Discovery shows that this representation is false in every respect:

(1)    *Tucker had no personal knowledge whatsoever* concerning these events or the facts asserted in her Declaration. Rather, *all* of the information she had regarding Plaintiff's social media post and the claimed controversy came second-hand from a five-minute conversation she had with George Warthen at approximately 1:22 P.M. on Sunday, September 14, 2025, and a similarly brief conversation Monday morning.  ECF 42-2 at 3, ¶ 2; ECF 42-6 at 88:8-91:24, 126-:13, 140:15-:19.

(2)    At her deposition, Tucker acknowledged that she had no personal knowledge of these facts and events and that all of the information she received from Warthen was hearsay:

Q    Do you know what the term hearsay means?

A    Yes.

Q    Would you agree that [your] information concerning social media posts and complaints into Fish and Wildlife was all derived from information that Mr. Warthen provided to you?

A    Yes.

Q    And you don't have any personal knowledge about any of those complaints or the social media complaints or the tone of them or whether they were belligerent or not, other than what Mr. Warthen communicated to you?

A    Yes.

ECF 42-6 at 141.

(3)    Tucker had no "firsthand involvement" in the events leading up to the firing decision. That decision was made by Defendant Young and communicated to her by Mr. Warthen. Tucker's only "involvement" was to process the termination letter. ECF 42-2 at 4-5, ¶ 5; ECF 42-5 at 11:9-12:7, 46:1-:19; ECF 42-6 at 88:1 -89:25, 92:13-:17, , 108:4-20; ECF 42-7 at 49; ECF 42-8 at 17:7-:10, 30:18-31:23.

(4)    Tucker made no "direct observation" of any facts at any point in the process. There was nothing for her to observe, as there was no meeting of staff to discuss the termination, and she conducted no social media research of her own. The only actions she took in response to the firing decision were to update and sign a template letter, arrange for personal delivery to the Plaintiff, and notify Human

Resources to process the termination. *Id*. She also played no role in FWC's response to the public in connection with the Whale Statement. ECF 42-6 at 113:3-:13.

(5)    Tucker did not review any "contemporaneous agency records maintained in the ordinary course of business." ECF 21-1 at 1-2, ¶ 2. She acknowledged at her deposition that there were no "records," and that she merely relied on the telephone call she had with Mr. Warthen:

Q      What records did you review to prepare this declaration?

A      The records were the information that I received from Mr. Warthen. So really I would say it's more phone calls than records.

ECF 42-6 at 126:9-:13.

The only documentation consulted by Director Young in connection with Plaintiff's termination were some social media posts on X and a text sent by Brian Smith.[2] But Tucker had never seen any of that information even at the time of her deposition. ECF 42-6 at 139:11-140:14, 141:11-:16. The only actual agency record of note was the OIG report prepared after Plaintiff was already fired. ECF 42-6 at 110:8-:24.  The OIG report was sent to Tucker, but she did not read it. *Id.* at 110:8-113:2.

---

[2] Smith's text was sent *after* the termination decision had already been made. ECF 42-5 at 20:25-21:9; ECF 42-16.

B.     Number of Complaints:

Within hours of that association, the agency's communications office began receiving a large volume of calls, emails, and online messages from citizens, volunteers, and partner organizations. …

Over the next two days, hundreds of citizen contacts, and multiple media inquiries were received across FWC's public channels….

ECF 21-1 at 2, ¶¶ 4-5. FWC did not receive "hundreds" of citizen contacts.

(1)    Tucker has no personal knowledge whatsoever concerning the number of complaints FWC received. Her source of information was Mr. Warthen. ECF 42-6 at 88:1-89:25, 141:6-142:1. But Warthen testified that he did not recall discussing citizen complaints with Tucker and would not have reported "hundreds" of contacts because he had no idea of how many contacts FWC received:

Q.    Have you discussed the volume of complaints coming into the agency with anyone during that time?

A.    I don't think I had direct conversations on volume of things coming in. I don't recall that.

Q.    Okay. Now, if someone said that there were hundreds of complaints that came in, would you know if that's true or not?

A.    I wouldn't be able to quantify that.

ECF 42-8 at 34:23-35:5.[3]

---

[3] Warthen recalled discussing Plaintiff's status as an OPS employee with Tucker over the weekend but could remember no other details of that conversation. ECF 42-8 at 17:7-18:25, 30:18-31:23.

Tucker ultimately acknowledged that Warthen did not give her a precise number and no one else had either:

Q    So you relied on Mr. Warthen's call to determine that there had been hundreds of these contacts?

A    Yes.

Q    Was that his phrasing?

A    No.

Q    Do you remember what his phrasing was?

A    I don't.

Q    Did someone else tell you a number?

A    No.

ECF 42-6 at 131:16-:25.[4]

---

[4]  This deception was materially advanced by defense counsel in their Response to Plaintiff's Motion for Preliminary Injunction. ECF 21. Counsel made two statements that suggested that there was abundant documentary evidence in support of the claim of hundreds of disruptive contacts:

Defendants, by contrast, have submitted sworn declarations grounded in firsthand knowledge *and supported by authenticated exhibits*.  ECF 21 at 4 (emphasis added).

Together, these sworn statements - *supported by authenticated policy excerpts, redacted complaint logs, and partner correspondence* - confirm that FWC acted lawfully and without viewpoint discrimination.  ECF 21 at 5 (emphasis added).

(2)     The FWC Director, Young, was unaware of the number or content of any citizen complaints that were directed to FWC:

Q     …. what information was available to you about the negative reaction to the whale statement?

A.     The number of comments on social media, the phone calls that were coming in, the e-mails, you know,  again, I don't -- I can't quantify them all.

ECF 42-5 at 23:22-24:3. Young had no information at all about the sources used to prepare the Tucker Declaration and played no part in drafting that document. *Id.* at 88:15-89:7, 91:6-:21.

The OIG report shows that, at the time Young made his termination decision (no later than Sunday afternoon, September 14th), FWC had received only *thirty-eight* email complaints. ECF 42-15.

(3)     Discovery shows the actual number of complaints FWC received:

(a)     A *total of 50 complaints* (inclusive of the Sunday emails) in the form of emails documented by OIG. ECF 42-15.[5]

---

Ultimately, Defendants introduced no supportive exhibits because none existed.

[5]   Among the complaints received by OIG was an email that did *not* object to Plaintiff's Whale Statement but instead objected to FWC's decision to terminate Plaintiff on account of her speech. ECF 42-7 at 100.

(b)     Two complaints were emailed to Young, which he did not answer. ECF 42-5 at 78:25-79:25, 145; ECF 42-21; ECF 42-24.

(c)     One email was sent directly to Defendant Tucker. ECF 42-20; ECF 42-6 at 138:9-139:4 ("Q:  And that was the only complaint you got during -- A:  That was the direct complaint that I got.").

(d)     One text was sent to George Warthen. ECF 42-8 at 27:13-28:2, 29:19-30:11; 42-17.

(e)     One email was sent to the communications office. ECF 42-22; ECF 42-9 at 106:15-107:23.

None of those complaints came from FWC employees, partner organizations or volunteers.[6]

Plaintiff notes that all of this information was obtained from FWC records through discovery. All of those records were readily available to Tucker and her counsel at the time she made her Declaration.

(4)     FWC regularly handles far larger controversies with little or no disruption to its daily activities. For instance, the controversial bear hunt approved by FWC last year drew more than 4,000 complaints - nearly a hundred times the

---

[6]  A sizable minority of the complaints received were from persons residing out of state with no connection to FWC or its employees. ECF 42-15.

attention attracted by the Whale Statement. ECF 42-5 at 31:15-:19; ECF 42-6 at 42:19-43:8; ECF 42-8 at 12:3-14:4. Some of those were threatening. ECF 42-5 at 31:18-:19 ("We -- we received a lot of threatening messages regarding the bear hunt."). In contrast, the complaints directed to the Whale Statement merely objected to the State spending funds to employ Ms. Brown; none were overtly threatening. ECF 42-9 at 84:18-85:10; ECF 42-15.

C.    No Agency Disruption:

> The volume and tone of these communications disrupted agency operations, required diversion of staff resources to manage responses, and raised legitimate concerns about the agency's credibility and public trust.

ECF 21-1 at 2, ¶ 5.

(1)    In her Answers to Interrogatories, Tucker acknowledges that she has no personal knowledge of any disruption to FWC operations:

> 1…    Defendant has no personal knowledge of any operational disruptions to FWC operations attributable to the Whale Statement, including any quantified payroll costs, facility-access issues, or additional security measures.

ECF 42-2 at 3, ¶ 1.

(2)    No deponent was able to identify even the slightest disruption of agency activities. Instead, the witnesses confirmed that: (a) there was no actual disruption;

(b) not a penny was spent for overtime, personnel reassignments, or anything else;[7]

(c) there was no law enforcement involvement; (d) there were no complaints from other employees; (e) there were no complaints from partner organizations, such as the Audubon Society;[8] and (f) FWC personnel gave no press conferences or interviews. ECF 42-1 at 3-5, ¶¶2, -6-8; ECF 42-2 at 3--4, ¶¶ 1-4; ECF 42-9 at 83:13-:24.

(3)     None of the complaints were threatening. In contrast to previous controversies where FWC had received actual threats, none of the emails referring

---

[7] The FWC's 30(b)(6) witness confirmed  no costs or instances of disruption were known to the agency and  FWC did not even attempt to find out this information:

> Q     The answer goes on to say, there's no documented payroll overruns; is that correct?
>
> A     Correct.
>
> Q     So there's not been an attempt to account for time spent on the whale statement or time spent on Ms. Brown's termination process?
>
> A     No.

ECF 42-9 at 83:13-:19.

[8] At her deposition, Tucker was asked directly whether Plaintiff's Whale Statement would interfere with FWC's work with partners such as the Audubon Society. Tucker responded that "I don't have an opinion on that either." ECF 42-6 at 72:13.

to Plaintiff's post had to be referred to law enforcement for investigation. ECF 42-5 at 29:3-31:7.[9]

11.    In light of that incontrovertible evidence, Defendants' counsel, as officers of the Court, were obligated to alert the Court to this fraud and take steps to correct the misrepresentation, including the striking of the Tucker Declaration. Defendants' counsel took no such action.

12.    Plaintiff has been harmed by the filing of the false Tucker Declaration and the failure to correct that filing in the following respects:

A.    She was denied a preliminary injunction in reliance on that fraudulent Declaration;

B.    Because there was no injunction entered, Plaintiff has been unemployed for months and has suffered the loss of back pay (which is not compensable from FWC under the Eleventh Amendment);

C.    Plaintiff's speech has been chilled during these intervening months because she is fearful that any controversial communications will impair her chances for reinstatement or employment by other government agencies.

---

[9]  Director Young recalled receiving "a lot of threatening messages regarding the bear hunt", and that he himself had received a death threat in connection with an arrest made by an FWC officer. ECF 42-5 at 31:8-:19. But no similar threats were received in connection with the Plaintiff's social media post. *Id.* at 29:3-31:19.

D.      Plaintiff's ability to prosecute this case has been hampered. Discovery has been delayed and inefficient because the Declaration misled Plaintiff's counsel as to the actual facts and evidence pertaining to the contested issues.[10]

E.      Plaintiff has incurred the expenses of this Motion.

## MEMORANDUM OF LAW

"'[T]ampering with the administration of justice ... involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public.'" *Trump v. Clinton*, 653 F.Supp. 3d 1198, 1209 (S.D. Fla. 2023) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). Plaintiff seeks the imposition of severe sanctions in response to an unusually severe misrepresentation foisted upon her and upon this Court. That misrepresentation has done damage to Plaintiff personally, the First Amendment rights we all cherish, and the administration of justice by this Court.

The Declarant, Melissa Tucker, knew that she was not competent to make her Declaration; she later testified without equivocation that she never had any personal knowledge concerning any of her key averments. Defendants' counsel cannot avoid culpability, as even the slightest inquiry would have disclosed that the Declarant was

---

[10] That prejudice was exacerbated by the fact that Defendants never served their Initial Disclosures and filed their Answer and Defenses only after being threatened with a default by Plaintiff's counsel. ECF 41.

Page 16 of 28

incompetent, and that her sworn statements were contradicted by records maintained by, and readily available to, FWC personnel.

This Court has the inherent authority to impose appropriate sanctions along with the parallel grant of authority provided by 28 U.S.C. §1927.[11]

A.   **The Court's Inherent Authority**

Beginning with the Court's own authority,[12] the Eleventh Circuit confirms that authority and counsels that the inquiry turns primarily on bad faith:

> A court may impose sanctions for litigation misconduct under its inherent power. *Chambers*, 501 U.S. at 43-44, 111 S.Ct. 2123; *In re Sunshine Jr. Stores*, 456 F.3d at 1304. The court's inherent power derives from the court's need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43, 111 S.Ct. 2123 (quotation marks and citation omitted). This power, however, "must be exercised with restraint and discretion."

---

[11]  The Court also has statutory authority to award sanctions on its own initiative under Fed. R. Civ. P. 11(c)(3):

> (3)   On the Court's Initiative. On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

Those proceedings are initiated through the issuance of an order to show cause and are governed under the procedural and substantive standards set forth in *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251 (11th Cir. 2003); *see also*, *ByoPlanet Int'l, LLC v. Johansson*, 792 F. Supp. 3d 1341, 1354 (S.D. Fla. 2025).

[12]  The "inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Trump v. Clinton*, 653 F.Supp. 3d 1198, 1209 (S.D. Fla. 2023) (quoting *Chambers*, 501 U.S. at 46); *see also*, *Williamson v. Trans Union LLC*, , 2025 WL 2443390, at *29 (M.D. Fla. 2025) (same).

*Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

"The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009).

"Conduct demonstrating bad faith includes 'delaying or disrupting the litigation,' [ ] and making false statements during a deposition for a 'harassing or frivolous purpose,'" *Strang v. Albany Georgia*, 759 F. App'x 755, 759 (11th Cir. 2018) (citations omitted). The Southern District of Florida decision in *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344 (S.D. Fla. 2005) is often cited for its useful recitation of the standards governing bad faith:

> Bad faith exists when the court finds that a fraud has been practiced upon it, or "that the very temple of justice has been defiled," *Chambers*, 111 S.Ct. at 2133, or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order. *Id*.; *see also*, *Malautea v. Suzuki Motor Co. Ltd.*, 987 F.2d 1536, 1545-46 (11th Cir. 1993). A finding of bad faith is warranted where an attorney-knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (*quoting Primus Automotive Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997)). In assessing whether an award is proper under the bad faith standard, "the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case". *See Rothenberg v. Security Management Co., Inc.*, 736 F.2d 1470, 1472 (11th Cir. 1984).

*Id*. at 1373.

Plaintiff is cognizant of the rule that "[s]tanding alone, a false or inconsistent statement in a deposition does not compel the conclusion of bad faith." *Byrne v. Nezhat*, 261 F.3d 1075, 1125 (11th Cir. 2001). However, a "false statement can be evidence of bad faith, if, for instance, there is other evidence in the record indicating that the statement was made for a harassing or frivolous purpose." *Id.* Neither is the Court required to abandon common sense; if conduct appears to be motivated by bad faith, it probably is. *See J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, 100 F.4th 1340, 1346-47 (11th Cir. 2024) ("[I]ntent can be inferred 'if an attorney's conduct is so egregious that it could only be committed in bad faith.'… Oxford Mall's wrongdoing here is startling in its obviousness. …. The district court's determination of bad faith is far more than 'plausible in light of the entire record,' and we do not disturb it.") (citation omitted)).

Tucker's sworn statements concerning the number of complaints received by FWC, and their supposed disruptive effect, are certainly false. But were they made in bad faith? There is ample reason to say "yes." The false statements were made by an affiant who obviously had no personal knowledge of the actual facts.[13] But more egregiously, the Declaration was the one and only piece of evidence that justified

---

[13] At an irreducible minimum, a declarant must have personal knowledge concerning the facts set forth in a sworn declaration. *See, e.g.,*, Fed. R. Civ. P. 56(c)(4).

the withholding of injunctive relief at the inception of this case. Defendants clearly intended that result when they filed the Declaration. That is seen in their briefing, their reference to "authenticated exhibits" and "redacted complaint logs" that did not exist, and the fact that the Declaration was the central focus of their argument at the injunction hearing. There could be no purpose served by that false Declaration other than to mislead the Court and further deprive Plaintiff of her First Amendment rights.

Proceeding on a false affidavit is a classic example of bad faith that will draw a judicial sanction:

> There is no doubt that Mathews filed false affidavits. Mathews' conclusory assertion that he did not do so "knowingly" is unavailing. It is safe to infer that Mathews acted intentionally. First, as a matter of common sense, the Court cannot imagine a circumstance in which Mathews' filing of false affidavits was accidental. Second, though ignorance of the law is not otherwise an excuse….

*Mathews v. Moss*, No. 09-22117-cv, 2011 WL 13134350, at *2 (S.D. Fla. Sept. 13, 2011), *aff'd,* 506 F. App'x 981 (11th Cir. 2013). This Court has not hesitated to impose sanctions where a false affidavit is filed in an effort to avoid a preliminary injunction

> There is little doubt in the undersigned's mind that Defendants acted in bad faith. They knowingly and intentionally fabricated a defense to the allegations against them and derailed this case through a series of lies to Secured Capital and the Court which spanned nearly four months. They did so to delay the litigation and to avoid a preliminary injunction. Moreover, it was only when the "gig was up" that they finally came clean.

Page 20 of 28

*Secured Capital. Group., LLC v. Pensacola Heritage Invs., LLC*, No. 3:25-cv-610-MCR-HTC, 2025 WL 3907745, at *2 (N.D. Fla. Dec. 12, 2025) (R&R, with no subsequent objections filed).

The Magistrate Judge in *Secured Capital* recommended default as the only appropriate sanction. *Id*. ("Those representations were undisputedly false. Defendants have abused the litigation process and committed fraud on the Court; their conduct warrants entry of a default judgment and no lesser sanction shall suffice."); *see also Cableview Commc'ns of Jacksonville, Inc. v. Time Warner Cable Se., LLC*, No. 3:13-cv-306-J-34JRK, 2016 WL 128561 at *12 (M.D. Fla. Jan. 12, 2016) ("[W]hen a party fabricates evidence purporting to substantiate its claims, federal case law is well established that dismissal is appropriate." (citation omitted)). Striking the Defendants' pleadings and entering a default would be an appropriate penalty in the instant case.

Defendants' attorneys cannot escape their own role in foisting this fraud on the Court. Plaintiff has previously noted that opposing counsel relied repeatedly on the Tucker Declaration in their briefing and argument, and they attempted to bolster those averments by suggesting that "authenticated exhibits" would be introduced to corroborate them. It is no excuse for defense counsel to argue that they were merely relying on their client:

> Instead Kleppin simply, and solely, relied on the word of his client. He believed his client, and believed his client's insistence that Plaintiff was a dishonest person, and on this basis alone felt justified in filing the affidavit with the Court. And he did this knowing next to nothing about Khan. This, indisputably, does not amount to a reasonable investigation. "Blind reliance on the client is seldom a sufficient inquiry...." *Southern Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986). As the Fourth Circuit has said: "We emphatically reject any suggestion that a lawyer may shield his transgressions behind the simplistic plea that he only did what his client desired." *Blair v. Shenandoah Women's Center, Inc.*, 757 F.2d 1435, 1438 (4th Cir. 1985).
>
> ….
>
> [T]his Court finds that Kleppin acted in bad faith when he filed the Khan affidavit with the Court and relied on it in his response memorandum. Kleppin was reckless, that is he "grossly deviate[d] from reasonable conduct," when he relied solely on the word of his client before filing the affidavit.

*Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1327, 1332 (S.D. Fla. 2007); *see also Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1255 (11th Cir. 1996) ("Bass argues, however, that he was under no obligation to conduct an independent investigation of the facts underlying Worldwide's claim before filing suit, and that he could rely on representations made to him by his long-time client, Block. We disagree, and hold that, under Rule 11, an attorney must make a reasonable inquiry into both the legal and factual basis of a claim prior to filing suit.").

Plaintiff has presented overwhelming record evidence - including testimony from Tucker's own lips - showing that she lacked the personal knowledge to make

her Declaration, and that the sworn statement is awash in false statements of fact. Defendants and their counsel had superior access to this information from the beginning, as they maintained all of the relevant records. Furthermore, Defendants' counsel sat in the same depositions, heard the same testimony, and reviewed the same documents as Plaintiff's attorneys. At some point, the light must surely have come on so that the bad faith nature of the Declaration and the harm it caused to Plaintiff would be obvious.

If the Court has any doubt as to that bad faith, it is authorized to conduct its own investigation in the manner it deems fit:

> A court also has the power to conduct an independent investigation to determine whether it has been the victim of fraud. *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002). This power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 503 U.S. at 43, 111 S. Ct. at 2132 (*citing Link v. Wabash R.R.*, 370 U.S. 626, 630-31, 82 S. Ct. 1386, 1389 (1962))…. And we have noted that courts have held that fabricating evidence and lying about it constitutes fraud on the court. *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978).

*Frazier v. Se. Georgia Health Sys., Inc.*, No. 24-10976, 2024 WL 4357399, at *1 (11th Cir. Oct. 1, 2024), *cert. denied,* 145 S. Ct. 1930 (2025); *see also Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) ("A court also has the power to conduct an independent investigation to determine whether it has been the victim of fraud.").

Page 23 of 28

**B.    Sanctions Pursuant to 28 U.S.C. §1927**

In addition to the Court's inherent authority, sanctions may be imposed pursuant to 28 U.S.C. §1927, which penalizes attorneys who purposely delay judicial proceedings:

> Lewis also appeals the district court's denial of sanctions under 28 U.S.C. §1927. Section 1927 is directed at the unreasonable and vexatious multiplication of proceedings. "Unlike Rule 11, which is aimed primarily at pleadings, under section 1927 attorneys are obligated to avoid dilatory tactics throughout the entire litigation." *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001); *see also LaSalle Nat'l Bank v. First Conn. Holding Group, LLC*, 287 F.3d 279, 288 (3d Cir. 2002) (stating that sanctions under 28 U.S.C. §1927 "are intended to deter an attorney from intentionally and unnecessarily delaying judicial proceedings" (emphasis in original)).
>
> "To justify an award of sanctions pursuant to section 1927, an attorney must engage in unreasonable and vexatious conduct; this conduct must multiply the proceedings; and the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct." *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003). An attorney multiplies the proceedings unreasonably and vexatiously "only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.' " *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007) (citation omitted). Bad faith is an objective standard that is satisfied when an attorney knowingly or recklessly pursues a frivolous claim. *Id*. at 1241.

*Peer v. Lewis*, 606 F.3d 1306, 1313-14 (11th Cir. 2010); *see also City of Jacksonville v. Shoppes of Lakeside, Inc.*, No. 3:12-cv-850-HES-MCR, 2025 WL 2988771, at *3 (M.D. Fla. Jan. 17, 2025) (quoting *Peer*, 606 F.3d at 1314 ("An attorney

unreasonably and vexatiously multiplies proceedings if he or she 'knowingly or recklessly pursues a frivolous claim.'")).

The standard for awarding attorney's fees under §1927 is lower than that required to impose the broader sanctions allowed under the Court's inherent authority. The emphasis under §1927 is an objective inquiry linking attorney conduct to delay rather than a subjective inquiry into bad faith. *See generally City of Jacksonville,* 2025 WL 2988771, at *3 ("But a court may only use its inherent authority to sanction subjective bad faith - a higher standard than §1927's.").

The fraudulent Tucker Declaration delayed the effective administration of justice in several ways. Most importantly, it delayed the entry of appropriate injunctive relief, which deprived Plaintiff of both her livelihood and her First Amendment rights. Secondly, it had the natural effect of delaying the final resolution of this case by requiring discovery and summary judgment briefing that could have been avoided had the Defendants "come clean" at the beginning of the case. For instance, if Tucker had truthfully stated that she had no personal knowledge about any events other than issuance of a template termination letter, her deposition could have been conducted in 15 minutes instead of the half day actually spent.

### C.    <u>The Appropriate Sanction</u>

The proper sanction is committed to the Court's informed discretion. *See generally Chambers*, 501 U.S. at 55 ("We review a court's imposition of sanctions

under its inherent power for abuse of discretion."). The misrepresentations complained of here are not accidental, nor can they be dismissed as careless error. Equally egregious is the fact that Tucker's fraudulent Declaration irreparably harmed Plaintiff's First Amendment rights for a period of months. *See generally Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Plaintiff suggests that the central role the Tucker Declaration played in this case merits the ultimate sanction of striking Defendants' pleadings and entering a default against them. *Compare Secured Capital*, *supra; Forsberg v. Pefanis,* 676 F. App'x 676, 680 (11th Cir. 2015). The Court should also consider an award against Tucker, individually, for the back pay lost to Plaintiff when her legal efforts to secure reinstatement ran into that Defendant's fraud. Attorney's fees are also awardable for the costs of this Motion and the delay occasioned by Defendants' bad acts.

Finally, the Court may consider directing Defendants' counsel to self-report to the Florida Bar even if a more severe sanction is not levied against them. *Compare Carter v. Wal-Mart Stores E., LP*, No. 1:19-cv-03907-WMR, 2021 WL 6622378, at *1 (N.D. Ga. Dec. 16, 2021) *aff'd*, No. 22-10174, 2023 WL 309034 (11th Cir. Jan. 19, 2023) ("Although the filing of the declaration appears unethical, such that Defendant's counsel should be embarrassed, the Court finds that Ms. Carter fails to establish bad faith by Wal-Mart…. Notwithstanding this decision, the Court orders

the Defendant's counsel immediately to report the filing of this fraudulent affidavit to the State Bar of Georgia and to provide proof to the Court within twenty-one (21) days of the date of this Order that it has so reported this transgression.").

WHEREFORE, Plaintiff moves this Court to severely sanction Defendants for filing and making use of the fraudulent Tucker Declaration and, that incident thereto, the Plaintiff recover her back pay, together with the expenses of this Motion and the attorney's fees incurred as a result of Defendants' delay and obfuscation.

## CERTIFICATE OF CONSULTATION

Plaintiff's undersigned counsel certifies that he has consulted with the Defendants' attorneys via e-mail on two occasions and has been advised that Defendants oppose the relief sought herein and will file a written response.

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion for Sanctions has been furnished to TAYLOR HAMPTON GREENE, Esquire [taylor@lawsonhuckgonzalez.com] and ROBERT E MINCHIN, III, Esquire [bob@lawsonhuckgonzalez.com], 101 E. College Avenue, 5th Floor, Tallahassee, Florida 32301; and to RHONDA E. PARNELL, Esquire [rhonda.parnell @myfwc.com], Florida Fish and Wildlife Conservation Commission, 620 South

Meridian Street, Tallahassee, Florida 32399-1600, by E-Mail this 25th day of February, 2026.


|  | /s/ Gary S. Edinger |
|---|---|
| AMERICAN CIVIL LIBERTIES FOUNDATION OF FLORIDA, INC. | GARY S. EDINGER, Esquire |
| CAROLINE A. MCNAMARA | Florida Bar No. 0606812 |
| Florida Bar No. 1038312 | BENJAMIN, AARONSON, EDINGER & PATANZO, P.A. |
| DANIEL B. TILLEY | 305 N.E. 1st Street |
| Florida Bar No. 102882 | Gainesville, Florida 32601 |
| MICHELLE MORTON | (352) 338-4440  (Fax) (352) 337-0696 |
| Florida Bar No. 81975 | GSEdinger12@gmail.com |
| SAMANTHA J. PAST | |
| Florida Bar No. 1054519 | |
| 4343 W Flagler Street, Ste 400 | |
| Miami, Florida 33134-1585 | |
| (786) 363-2738 | |
| CMcNamara@aclufl.org | |
| dtilley@aclufl.org | |
| mmorton@aclufl.org | |
| spast@aclufl.org | |

*Attorneys for Plaintiff*


## CERTIFICATE OF COMPLIANCE

This Motion complies with the type-volume limitation of Rule 7.1(F), N.D. Fla.Loc.R. This Motion and Memorandum contain 6,012 words, excluding the parts of the Motion exempted by Rule 7.1(F).