**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**BRITTNEY BROWN,**

    **Plaintiff,**

**vs.**                           **Case No. 4:25-cv-419-MW-MJF**

**ROGER A. YOUNG and
MELISSA TUCKER,**

    **Defendants.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

This cause is before the Court pursuant to an Order by U.S. District Judge Mark E. Walker referring Plaintiff's motion for sanctions, ECF No. 44, to the undersigned U.S. Magistrate Judge for an evidentiary hearing. ECF No. 45. After Defendants filed a response, ECF No. 47, a hearing was held before the undersigned on March 18, 2026. Both parties have now filed their written closing arguments. ECF Nos. 56, 57. This matter is ripe for review.

## I.    Relevant Procedural History

Plaintiff moved for a preliminary injunction on October 3, 2025. ECF No. 8; 8-1 through 8-7. On October 30, 2025, Defendants filed a response and attached a single declaration from Defendant Melissa Tucker. ECF No. 21; 21-1 ("Tucker affidavit" or "affidavit"). The Tucker affidavit was signed under the penalty of perjury by Ms. Tucker on October 28, 2025. <u>Id.</u> at 1, 3.

The preliminary injunction hearing was held on November 10, 2025. Neither party requested limited discovery prior to the hearing. *PI Transcript*, ECF No. 30 at 5. Neither party called any witnesses, instead relying solely on the declarations. Id. Judge Walker denied Plaintiff's motion for preliminary injunction, in large part due to the "unrebutted" Tucker affidavit. See *Order*, ECF No. 26 at 11-12. After regular discovery began, depositions and interrogatories revealed facts in conflict with the Tucker affidavit. Plaintiff deems the affidavit fraudulent and seeks sanctions. See ECF No. 44. Defendants disagree. See ECF No. 47.

One other matter needs to be addressed before moving forward. The day before the sanctions hearing, Plaintiff filed a motion to exclude the exhibits attached to Defendants' response to the sanctions motion. ECF No. 52. Neither party raised the motion to exclude at the hearing, but Defendants declined to introduce any evidence and did not reference or rely on the disputed exhibits in their closing arguments. See *Transcript*, ECF No. 54 at 97:13-15; *Defendants' Closings,* ECF No. 57. Then weeks after the hearing, Defendants filed a response in opposition to Plaintiff's motion to exclude, arguing the exhibits (that they did not even use) should not be stricken "wholesale," claiming they "relied on those materials" only for authentication, "context…and [to] "rebut [Plaintiff's] premise that public reaction [to Plaintiff's

4:25-cv-419-MW-MJF

post] was fabricated." See ECF No. 58 at 3.

Defendants' post-hearing response and the exhibits themselves are a little baffling. While Defendants included the exhibits in their response to Plaintiff's motion for sanctions, it can hardly be said they "relied on" any because Defendants did not refer to or seek admission of those materials at the evidentiary hearing or in written closings. Even if they had been admitted or referenced, the evidentiary value of those materials for this issue is zero. Defendants include screenshots of various comments on several of FWC's Facebook posts from late August through early September 2025 and the September 14, 2025 "Libs of TikTok" thread on X about Plaintiff's Instagram re-post.[1] ECF Nos. 47-4 through 47-10. These screenshots were obtained by FWC interns in March 2026 in preparation for the sanctions hearing, after discovery closed. See ECF Nos. 47-1 through 47-3.

Notwithstanding the potential discovery issue, Defendants cannot impute knowledge of these comments to Ms. Tucker just because they exist on the Internet. The issue is whether Tucker had *personal knowledge* of what she swears to in her affidavit, *at the time* she swore to it. Tucker did not have personal knowledge of Defendants' challenged exhibits at the time of the

---

[1] Plaintiff also included the "Libs of TikTok" X post, without the comments, in her motion for preliminary injunction. ECF No. 8-3.

declaration, or even at the time of the hearing—she was never presented with the posts to review or authenticate. And as discussed later, her own social media review was a very limited one-time glance on Facebook after Plaintiff's firing. See infra at 13 n.6. Therefore, Plaintiff's motion to exclude Defendants' evidence, ECF No. 52, should be denied as moot because Defendants failed to offer the evidence at the hearing, and even if they had, the evidence is not relevant to the current issue.

## II. Discussion

The issue presented by Plaintiff's sanctions motion is not complex. Plaintiff asserts that the Tucker affidavit contained false statements, was submitted and relied upon by Defendants in bad faith, and resulted in the wrongful denial of Plaintiff's motion for a preliminary injunction. See ECF No. 44. Plaintiff seeks a remedy for that wrong. For their part, Defendants do not contend that the information provided in the Tucker affidavit was 100% accurate. See ECF No. 57 at 2 (admitting Tucker's use of "personal knowledge" and "hundreds of contacts" was shown at the evidentiary hearing to be imprecise, but arguing "[i]mprecision is not fraud"). They also acknowledge that the information suffers from "evidentiary" and "foundation" issues. E.g., ECF No. 47 at 2, 29. While they may not go as far as to say it explicitly, there is no question that the information provided to Judge Walker

was not verifiably true at the time it was submitted.

When a witness testifies, whether by declaration, affidavit, or live in front of the Court from the witness stand, they are required to tell the truth, the whole truth, and nothing but the truth. E.g., Fed. R. Evid. 603; 28 U.S.C § 1746. It's a three part agreement. The "truth" is that which is verifiable, compared to a standard that is known to be accurate. The "whole truth" is a commitment to not exclude information which is relevant to the inquiry. "Nothing but the truth" means that the witness will not embellish or expand that which is known to be true to include exaggeration or extension. Tucker committed to providing true information under such restrictions. See ECF No. 21-1 at 1, 3. Her affidavit does not live up to that standard. And the words she used in her affidavit are important.[2]

## A.    The Tucker Affidavit

First, Tucker states in her affidavit that her representations are "based on my personal knowledge and review of official Florida Fish and Wildlife Conservation Commission (FWC) records." ECF No. 21-1 at 1. She also contends that she has "personal knowledge of the circumstances

---

[2] At the hearing, Tucker testified that she did not prepare the affidavit for herself, but before signing it she reviewed it for accuracy and even edited it. ECF No. 54 at 24:14-20, 25:1-11 ("There was a statement that I had received calls from partner organizations, and I removed that because I had not received calls from partner organizations"). Thus, the affidavit became her own words once she signed and swore to it.

surrounding the termination of [Plaintiff's] employment and of the events leading up to and following that decision" and that her statements "are based on firsthand involvement, direct observation, and contemporaneous agency records maintained in the ordinary course of business." Id. ¶ 2. These statements relate to the sources of the information used by Tucker in formulating the testimony contained within her affidavit.

Beyond that, Tucker asserts that "within hours" of FWC becoming aware of Plaintiff's post,[3] "the agency's communications office began receiving a large volume of calls, emails, and online messages from citizens, volunteers, and partner organizations" and that "[m]any expressed concern or outrage, questioning whether the post reflected FWC's values or political neutrality." Id. at 2 ¶ 4. Tucker goes on to state that "[o]ver the next two days, hundreds of citizen contacts, and multiple media inquiries were received across FWC's public channels" and that "[t]he volume and tone of these communications disrupted agency operations, required diversion of staff resources to manage responses, and raised legitimate concerns about the agency's credibility and public trust." Id. at ¶ 5.

---

[3] FWC become aware of the post via Defendant Young during the evening of Saturday, September 14, 2025. Tucker did not find out until the next day, when Mr. Warthen called her and told her there had "been escalating social media campaigns, information, and that [Young] had decided that [Plaintiff's] employment would be terminated." ECF No. 54 at 30.

4:25-cv-419-MW-MJF

There are two separate issues at play with the content of the above paragraphs: the purported versus actual source of Tucker's knowledge; and the actual accuracy of the statements, regardless of the source.

## B.    Source of Information

First, the source of Tucker's information. In reality, and as admitted by Tucker during the hearing, the statements at issue in her affidavit were not based on her "personal" knowledge, "firsthand involvement," or "direct observation," but were based on conversations she had with two other FWC employees, Mr. Warthen and Ms. Blunden, and possibly a conversation with Director Young sometime after the termination. ECF No. 54 at 25-26, 53-59. Moreover, while Tucker claimed to base her affidavit on FWC records, the only documents she reviewed prior to Plaintiff's termination on September 16, 2025 was FWC policy relating to OPS employment, confirming that Plaintiff was subject to termination without any sort of pre-termination hearing process.[4] Id. at 27, 60.

Defendants contend there was no intent to mislead or deceive the Court regarding the source of Tucker's information; instead, she merely had a different understanding of what is meant when one refers to "personal

---

[4] During her deposition, Tucker testified that the phone calls to her and the hearsay statements by others were part of the "records" she reviewed. *Tucker Deposition*, ECF No. 42-6 at 126:9-13. She did not repeat this bizarre claim at the hearing.

knowledge," "firsthand involvement" and "direct observation." <u>E.g.</u>, ECF No. 57 at 4-5. But secondhand information is not firsthand involvement. It is hearsay. <u>See</u> Fed. R. Evid. 801(c) ("Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted"). In Tucker's case, it was mostly hearsay within hearsay. Tucker conceded to as much at the hearing. ECF No. 54 at 26:16-24 ("The information that I received from [Blunden and Warthen] was…their relying on information that they were getting from [Young], and from themselves, and that Ms. Blunden was hearing from [Plaintiff] directly"; Q: "Okay. But it's not information that you heard with your own ears or saw with your own eyes, correct? A: "Correct."). Even giving some credit to the notion that a layperson might consider hearsay to be firsthand involvement, direct observation, or personal knowledge, it does not alleviate the Court's concern that Tucker misrepresented the foundation of her information in the affidavit. And ignorance of the law, particularly where an affiant is represented by counsel, is not an excuse.

Tucker could have appropriately stated in the affidavit that she was aware of these matters from her conversations with persons within FWC. Such a statement would have been accurate and would not have impacted the relevance or admissibility of the affidavit. It was, after all, filed in

4:25-cv-419-MW-MJF

opposition to a motion for preliminary injunction—not summary judgment. Compare Levi Strauss & Co. v. Sunrise Intern. Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding") with Fed. R. Civ. P. 56(e) ("An affidavit or declaration used to support or oppose [summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated").

But the mischaracterization of Tucker's source of information could have impacted the *weight* to be assigned to the affidavit and each statement within. Tucker's affidavit explicitly paints the facts from personal knowledge, not hearsay. In truth, most of her affidavit was based on information and belief. The difference matters. See Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc., 446 F.2d 353, 357 (5th Cir. 1971) ("While we do not rule out the possibility that hearsay may form the basis for, or contribute to, the issuance of a preliminary injunction, the district courts have shown appropriate reluctance to issue such orders where the moving party substantiates [their] side of a factual dispute on information and belief"). The

harm here is that Judge Walker was not provided with an accurate picture of what Tucker actually knew personally as opposed to what she learned from discussions with others. Such information may have impacted whether Judge Walker would have relied on such an affidavit in denying the motion for preliminary injunction.

## C.   Accuracy of the Affidavit

Beyond the questions regarding the source of Tucker's information, a more troubling question is whether several of the statements in the affidavit are true and accurate. The statements at issue, as raised by Plaintiff, are within paragraphs 4 and 5. Each is addressed below.

Paragraph 4 of Tucker's affidavit claims that "within hours" of Plaintiff's post, "the agency's communications office began receiving a large volume of calls, emails and online messages from citizens, volunteers, and partner organizations." ECF No. 21-1 at 2 ¶ 4. Tucker had no knowledge to support most of this statement. First, Tucker had no knowledge or evidence of the volume of calls, emails, or messages. ECF No. 54 at 61-63. This is because no one quantified the number or type of communications for her and she did not independently seek it out. E.g., Id. at 32-33, 42:25-43:1-2 (when asked by Plaintiff's counsel whether Warthen provided her "any information" about "the number of calls" coming in, Tucker testified that she "did not ask");

*Tucker Deposition*, ECF No. 42-6 at 131 (Q: "So you relied on Mr. Warthen's call to determine that there had been hundreds of these contacts?" A: "Yes."; Q: "Was that [Warthen's] phrasing?" A: "No."; Q: "Do you remember what his phrasing was?" A: "I don't."; Q: "Did someone else tell you a number?" A: "No."). Further, Tucker admitted in her deposition that it was not the "agency's communications office" receiving the contacts, but members of the executive team, including the executive director. ECF No. 42-6 at 128:11-19 (stating in part, "it could not be the communications office" because it was happening on a Sunday when the office was closed).

Second, there is no evidence to support that Tucker knew *who* was making these calls or messages. While "citizens" is broad enough to include all human beings, "volunteers" and "partner organizations" are specific terms used for a specific meaning—to show harm and disruption to FWC's reputation and operations. But Tucker had no knowledge that volunteers or partners were reaching out. See ECF No. 54 at 43:3-8 (Q: "In terms of…who called, did you have any information about that?" A: "I didn't."), 62:16-18 (Q: "Do you have any specific knowledge that a volunteer called to complain?" A: "I do not"); 62:25-63:2 (Q: "Isn't it fair to say you have no information about partner organizations complaining about [Plaintiff's] post?" A: "Correct."), 44 (testifying that Warthen did not tell her who was calling or if agency partners

had reached out and confirming that none had reached out directly her).[5]

Similarly, in paragraph 5 of Tucker's affidavit, she states that "over the next two days, hundreds of citizen contacts, and multiple media inquiries were received across FWC's public channels." ECF No. 21-1 at 2 ¶ 5. Tucker had no basis for this assertion. Even at a hearsay level, *no one* told her hundreds of contacts were coming in. At best, Tucker now claims she "used the word 'hundreds' in a generalized context." ECF No. 54 at 32. Yet she went on to state that it meant "many, more — hundred or more, but definitely not a tallied count of the number of complaints or anything that came in." Id. Then she waffled again, claiming "it implie[d] a generalized sense that there were many complaints that were coming in" and "it was an attempt to give context around the fact that this was an escalating situation and the numbers were continuing to grow." Id. at 33. Tucker also admitted that prior to Plaintiff's firing, she made *no* effort to quantify the number of calls or contacts to FWC regarding Plaintiff's post. Id. at 34. Even at Tucker's deposition in

---

[5] To anyone else, it would not be true to say you have personal knowledge of "a large volume" of contacts from "volunteers and partner organizations" when you actually have no information that any contacts came from volunteers or partner organizations. Tucker disagrees. See ECF No. 54 at 62:19-22 (declining to admit that including "volunteers" was inaccurate, instead stating, "I should have been more clear that" it was "specific to general citizens"); 63:3-6 (declining to admit including "partner organizations" was untrue, stating, "Again, I was hearing from our executive director's office that they were getting a variety of calls. And I don't know, some of them may have been from partner organizations."). This type of reckless speculation and outright falsity has no place in a sworn declaration.

January 2026, she was unsure of the number of contacts. ECF No. 42-6 at 132 (Q: "Is it possible that there were fewer than a hundred [contacts]?" A: "I don't know").[6]

The troubling fact is that Tucker had access to a specific number of complaints made to the agency as of 1:15 PM on Monday, September 15th but chose not to review it. This information was delivered directly to her email inbox in the form of a report from the FWC Office of the Inspector General (OIG). ECF No. 54 at 35; *OIG Report*, ECF No. 42-15. The report notes "numerous complaints concerning" Plaintiff's post and includes contact information for approximately 50 people who complained to OIG. ECF No. 42-15 at 18, 21-43. It's not clear what Tucker did with the report. She claimed she "looked at it" but "did not review it in detail." ECF No. 54 at 35. She did not count the number of the complaints. Id. When asked why, Tucker stated "the report was there and it was available for someone to look at if they needed to, but I did not need to count." Id. She never went back and reviewed the OIG report in preparation of her affidavit or in preparation for the

---

[6] At the hearing, Tucker claimed she looked at Facebook sometime after Plaintiff was fired, "towards the end of September [2025]," before signing the declaration. ECF No. 54 at 33, 79, 86. She typed Plaintiff's name and "FWC" into the Facebook search bar and saw "many" posts from "people who were upset." Id. She did not screenshot the posts. Id. at 80. She did not mention the search to anyone until she was preparing for the sanctions hearing and told FWC's legal office. Id. at 80-81. She does not know when any of those posts or comments were made, so her implication that these are included within her personal knowledge of "hundreds" of contacts over a specific two-day period fails.

sanctions hearing. Id. at 37.

Tucker's affidavit also asserts that "[t]he volume and the tone of these communications disrupted agency operations, required diversion of staff resources to manage responses and raised legitimate concerns about the agency's credibility and public trust." ECF No. 21-1 at 2 ¶ 5. Other than possibly interrupting Young's Saturday evening of watching football and requiring a phone call amongst members of the executive committee, there was no evidence of disruption of agency operations or diversion of staff resources, especially over the two days in question. ECF No. 54 at 45-46.

Further, both Tucker and Young, in their respective interrogatories submitted in December 2025, admitted there was no actual agency disruption. ECF No. 42-2 at 3 (Tucker "has no personal knowledge of any operational disruptions to FWC operations attributable to [Plaintiff's post]"); ECF No. 42-1 at 3-4 (Young cites "reputational concerns" and "a reasonable prediction of disruption, though no documented payroll overruns, facility access impairments, or security deployments were identified"; denies knowledge of "any instance in which a partner refused to work with FWC or altered its relationship with the agency due to [Plaintiff's post]"). This might be the clearest case of a lie in Tucker's affidavit: she swore to have personal knowledge that Plaintiff's post disrupted agency operations, only to swear a

4:25-cv-419-MW-MJF

month later that she had no personal knowledge of such a thing. What's more, it is clear that there was no actual disruption.

## D.    Impact and Prejudice

Defendants explain these inaccuracies and shortcomings as nothing more than imprecise language. But that is not nothing. Tucker's affidavit fails to adhere to the obligation to tell the "whole" truth and "nothing but the truth." It leaves out pertinent information such as the source and basis for the assertions contained in the affidavit. It overstates the actual extent of the impact of Plaintiff's Instagram post—especially in the two days before her termination. Tucker could have accurately reported that she received a phone call from her supervisor who said that Young became aware of an employee's Instagram post receiving a negative social media backlash. Such testimony may have been sufficient to convince the Court that a preliminary injunction was not appropriate because of the potential for disruption.

Instead of that accurate report, Tucker reported a large volume of calls, emails and messages from specific types of people; and hundreds of citizen contacts and multiple media inquiries that resulted in actual agency disruption. Such embellishment was intended to sway the Court to deny the preliminary injunction. This is confirmed by Defendants' own argument in response to Plaintiff's motion for preliminary injunction:

> Defendants, by contrast [to Plaintiff's declarations], have submitted sworn declarations grounded in firsthand knowledge and supported by authenticated exhibits. Those declarations show that Plaintiff's public identification as an FWC employee caused operational disruption and concern among agency partners . . .

ECF No. 21 at 4. Despite this claim, Defendants offered no exhibits, authenticated or otherwise, outside of Tucker's affidavit. Defendants then dug in on the importance of the Tucker affidavit at the preliminary injunction hearing:

> [Defense counsel]: First, I'd like to point to the statements referencing the conclusory nature or alleged conclusory nature of Ms. Tucker's declaration. It's concise, but it's specific…her declaration noted, again, hundreds and hundreds of complaints via citizen calls, emails, partner requests, and media inquiries.

ECF No. 30 at 54:3-12. When Judge Walker pushed back on what would be sufficient to make the affidavit more than conclusory, Defendants agreed:

> [Judge Walker]: It seems to me that if the declaration of Ms. Tucker had simply said, we received complaints, and based on the complaints, we concluded it would be disruptive, Judge, there's actual facts beyond that conclusion, which is there's hundreds of citizen contacts, multiple media inquiries, and the volume and the tone were negative, so, Judge, she may not have written a tome on it, but she did provide facts underlying the conclusion; correct?
>
> [Defense counsel]: That's correct, yes.
>
> [Judge Walker]: And your view is, Judge, based on those facts, whether you believe they are a scam or not, that's enough for us and it would be the plaintiff's burden to overcome those facts; correct?
>
> [Defense counsel]: That's correct, Your Honor.

Id. at 55:2-15. The specific number, volume, and nature of the calls clearly

mattered to the analysis:

> [Judge Walker]: But what we do know is I've got Ms. Tucker who is under oath who said that they got hundreds of citizen contacts. So that could be—"hundreds" would be more than 100, so it could be 200; it could be 900— and also multimedia inquiries, and that the volume and the tone—so it's not just the number, but it was the tone of them.

Id. at 58:20-25.

Contrary to Tucker's oath, her affidavit was not grounded in personal knowledge, firsthand involvement, direct observation, and contemporaneous agency records. See ECF No. 21-1 at 1, 1-2 ¶ 2. She could not have knowingly sworn that there were "hundreds" of contacts because she made no attempts to quantify the actual number. See Id. at 2 ¶ 5. She swore there had been "a large volume" of contacts from various people, choosing to specifically include "volunteers" and "partner organizations," when she had no idea who or how many were reaching out. It's highly suspect that she could have known there was actual operational disruption to FWC as a result of Plaintiff's post because both Tucker and Young later denied there was any. Yet Judge Walker relied on the misrepresentations in her affidavit when making his ruling.

"When parties and attorneys prepare affidavits on behalf of witnesses to sign under penalties of perjury, care must be taken to ensure their testimony is being set forth accurately. Sloppiness in preparing accurate witness affidavits cannot be excused on the basis that opposing counsel may

impeach the witness" later if "an inconsistency" is ever discovered. Pappas v. Hurst, 2018 IL App (1st) 171759-U, ¶ 47, 2018 WL 3814934 at *11.[7] It does not appear that sufficient care was taken to confirm the accuracy of Tucker's affidavit. That falls not only on Tucker, but also on Defendants' counsel and their due diligence, or lack thereof.

Even after everything, Tucker continues to maintain that the affidavit is accurate. ECF No. 54 at 24-25. It could be that Tucker *believed* she was testifying truthfully when she signed the affidavit because she believed the information in the affidavit to be true. But there is a difference in believing something is true based on a game of telephone and overall vibes, and knowing something is true based on experiencing it firsthand and ensuring due diligence. Sworn affidavits demand more than vibes. Words matter. Tucker's explanation is that she said "personal knowledge" when she meant "I learned from others." She said "hundreds" when she meant "many" based on her "generalized impression." She said there was actual "disruption" and "diversion" when she meant that disruption and diversion were possible. As discussed below, the Court does not find Tucker's explanation credible given the circumstances and her attempts at minimization. These were not slight

---

[7] *Pappas* is an unpublished state appellate court decision, but the Court finds the quoted language applicable and persuasive here.

4:25-cv-419-MW-MJF

mistakes. What's worse, the inaccuracies may have impacted the district court's ruling at the preliminary injunction stage.

## E.    Sanctions

"The inherent powers of the federal courts include the authority to fashion sanctions for conduct that abuses the judicial process." <u>J.C. Penney Corp., Inc. v. Oxford Mall, LLC</u>, 100 F.4th 1340, 1346 (11th Cir. 2024). "Courts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority." <u>Purchasing Power, LLC v. Bluestem Brands, Inc.</u>, 851 F.3d 1218, 1225 (11th Cir. 2017). The question of sanctions hinges on a finding of subjective bad faith by a party. <u>Id.</u> at 1223-1224; <u>Barnes v. Dalton</u>, 158 F.3d 1212, 1214 (11th Cir. 1998).

A finding of bad faith is fact specific given the circumstances of the case, but encompasses a broad enough range of conduct so a district court's hands are not tied. It may arise with conduct that "delays or disrupts the litigation or hampers a court order's enforcement." <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 33 (1991). Reckless conduct, or a false statement, "can be a starting point," but neither are sufficient alone to warrant bad faith. See <u>Purchasing Power, LLC</u>, 851 F.3d at 1225; <u>Byrne v. Nezhat</u>, 261 F.3d 1075, 1125 (11th Cir. 2001), <u>abrogated on other grounds as recognized by Jackson</u>

4:25-cv-419-MW-MJF

v. Bank of Am., N.A., 898 F.3d 1348,1357 n.10 (11th Cir. 2018). There must be something additional, like frivolousness or a harassing purpose. Id. Intent can be inferred from the circumstances. J.C. Penney Corp., Inc., 100 F.4th at 1346.

This is not a case of a single false statement, or imprecise language that could have been better defined. Tucker's affidavit is replete with problems. She knew her source of information was hearsay, yet she signed an affidavit under oath claiming she had firsthand involvement and personal knowledge. She had no knowledge (from hearsay or otherwise) of the number of contacts, yet swore there were hundreds. The same is true for any actual agency disruption, yet again, she swore there was.[8] These statements were not just reckless, but knowingly false. She made no effort to correct the record with the Court after the issues were raised during her deposition. It was not until Plaintiff filed the current sanctions motion and Tucker testified at the hearing that she finally had to face the music. But instead of admitting the issues, she minimized. After everything, she had the audacity to claim she still believed the affidavit was true and accurate.

Her    knowing    and    material    omissions,    mischaracterizations,

---

[8] Until around two months later, when she swore to the opposite in her interrogatory response.

embellishments, falsehoods, and willful refusal to read the OIG report all lead to one conclusion: the motivation behind her affidavit was not to provide true information to the Court, but to blindly support the agency's legal theory with enough testimonial evidence to defeat a preliminary injunction. This intent is further supported by Defendants' arguments in their response to the injunction and during the injunction hearing, as well as defense counsel's failure to verify Tucker's affidavit with due diligence. It was result-oriented testimony and argument without regard for accuracy. These actions disrupted litigation and are an abuse of the judicial process. There is sufficient bad faith to warrant sanctions.

In deciding the appropriate sanction, Plaintiff's conduct cannot be ignored. Plaintiff had every opportunity to request expedited discovery prior to the preliminary injunction hearing. She declined. She also had every opportunity to call witnesses at the injunction hearing, including Tucker, yet chose to rely only on the affidavits. Had Plaintiff taken the simple step of questioning Tucker at the injunction hearing, most of the information in her affidavit could have been tested. Plaintiff should not reap the benefit of the ultimate sanction of default judgment when her own failures encouraged the delayed discovery of this issue.

That said, the Court must be able to rely on sworn testimony submitted

by a litigant, especially when that litigant is represented by counsel. See Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc., 498 U.S. 533, 544-46 (1991) (the signature of a party, even when represented, "denotes merit" and "sends a message to the district court that this document is to be taken seriously"). The narrowest sanction this Court can discern which will punish Defendants' bad behavior, discourage such behavior in the future, and remedy the harm to Plaintiff without rewarding her for her own lack of diligence in challenging the affidavit during the injunction stage, would be to strike the offending paragraphs and language[9] from Tucker's affidavit and allow the district court to proceed with whatever course it chooses with respect to Plaintiff's motion for a preliminary injunction.[10] That is the sanction the undersigned recommends would be appropriate here.

## III.    Recommendation

For the reasons discussed, it is respectfully **RECOMMENDED** that Plaintiff's motion for sanctions, ECF No. 44, be **GRANTED in part**, as noted above, and Plaintiff's motion to exclude Defendants' evidence, ECF No. 52,

---

[9] Plaintiff challenged paragraphs 4 and 5, but paragraph 2 contains Tucker's purported source of information. The ultimate decision on what should be stricken or re-weighed should be left to the district court.

[10] The undersigned makes no judgment regarding whether the remaining evidence before the district court would have been sufficient to change the outcome of the injunction hearing. Moreover, Plaintif's entitlement to attorneys' fees in this matter will ultimately be driven by the district court's conclusion on Plaintiff's motion for a preliminary injunction. No such award of fees is made at this time.

be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida on April 9, 2026.

<u>s/ Martin A. Fitzpatrick</u>
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**

**<u>NOTICE TO THE PARTIES</u>**

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. <u>See</u> 11th Cir. Rule 3-1; 28 U.S.C. § 636(b)(1)(C).**

4:25-cv-419-MW-MJF